UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X

JOEL ROSS, ERIC LEVINE, and
JERDE DEVELOPMENT COMPANY,

               **Plaintiffs,**

    - against -

STANLEY E. THOMAS and S.
THOMAS ENTERPRISES OF
SACRAMENTO, LLC,

               **Defendants.**

-------------------------------------------------- X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/5/09
```

**OPINION AND ORDER**

**09 Civ. 5631 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

Joel Ross, Eric Levine, and Jerde Development Company are suing

Stanley E. Thomas and S. Thomas Enterprises of Sacramento, LLC

("Enterprises"), alleging breach of contract against both defendants and breach of

guarantee against Thomas. Plaintiffs seek damages in excess of ten million dollars

and a declaratory judgment entitling them to inspect various Enterprises records.

Thomas and Enterprises jointly move to dismiss for lack of personal jurisdiction

pursuant to Federal Rule of Civil Procedure 12(b)(2), and request a  stay of

discovery pursuant to Rule 26(c).  For the following reasons, both motions are denied.

## II.     BACKGROUND[1]

Plaintiffs Levine and Ross work in New York.[2]  Plaintiff Jerde Development Company is owned by California-based architect Jon Jerde.[3] Defendant Thomas is a Georgia resident with an office in Georgia.  Defendant Enterprises is a Delaware LLC headquartered in Georgia.[4]

In early 2002, plaintiffs agreed to collaborate in an effort to acquire and develop approximately 238 acres of land owned by Union Pacific Rail Yards in downtown Sacramento, California.[5]  Because they needed a capital partner on the project, plaintiffs initiated negotiations with Thomas.[6]  After negotiations in

---

[1]      The following facts are drawn from the parties' submissions and are presumed to be true for the purposes of this motion.

[2]      *See* Complaint ("Compl.") ¶ 11.

[3]      *See* Affidavit of Eric Levine in Opposition to Defendants' Motion to Dismiss ("Levine Aff.") ¶ 7.

[4]      *See* Memorandum of Law in Support of Defendants' Motion to Stay Discovery and to Dismiss the Complaint ("Def. Mem.") at 1.

[5]      *See* Compl. ¶¶ 12-13.

[6]      *See id.* ¶¶ 14-15; Levine Aff. ¶¶ 8-9.

2

Atlanta and New York, Thomas agreed to fund the project.[7]  Thereafter, the parties treated the project as a joint venture.[8]

Levine was appointed Project Manager and ran the project primarily from his New York office until at least July, 2004.[9]  Between May 2003, and June 2005, Thomas wired money to a New York bank account for Levine to pay the professional team — attorneys, architects, an engineer, and a public relations consultant — for services related to the project.[10]  Levine regularly reported to Thomas regarding the project's progress and the use of Thomas's funds.[11]

After the initial meetings in Atlanta and New York, Thomas or his associates met with plaintiffs in New York on at least eight occasions:

- In July 2002, Thomas's associates met with Levine and Ross to discuss potential financial arrangements and the relationship between the project's parties.[12]

- On December 4, 2002, Thomas and his associate met with Levine

---

[7]     *See* Compl. ¶¶ 14-15; Levine Aff. ¶¶ 8-9.

[8]     *See* Levine Aff. ¶ 10.

[9]     *See* Compl. ¶ 16.

[10]    *See* Levine Aff. ¶¶ 17, 34-35.

[11]    *See id.* ¶ 17.

[12]    *See id.* ¶ 12.

3

to discuss equity interests in the project.[13]

- In April 2003, Thomas's associate met with Levine to negotiate the agreement under which equity interests were determined.[14]

- On December 16, 2003, Levine and Ross met with Thomas's attorney to discuss the project's equity structure.[15]

- On April 16, 2004, Thomas's associate met with Levine and Ross to discuss Thomas's potential buy-out of the project's equity interests.[16]

- On May 4, 2004, Thomas's attorneys met with Levine, Ross, and Union Pacific Railyards to negotiate an agreement detailing the sale of the Sacramento property.[17]

- In November 2004, and again in December 2004, Thomas's representatives met with Levine to discuss a project-related insurance policy with AIG representatives.[18]

Thomas and his associates also conducted business with the New York plaintiffs

---

[13]   *See id.* ¶ 15.

[14]   *See id.*

[15]   *See id.* ¶ 21.

[16]   *See id.* ¶¶ 22-23.

[17]   *See id.* ¶¶ 22-26.

[18]   *See id.* ¶¶ 36-38.

via telephone, facsimile, and email,[19] although the parties dispute the frequency and substance of these communications.[20]

Over the project's course, the parties operated under a series of contracts. Thomas and his associates negotiated the first contract — dated May 20, 2003 — in New York with Ross and Levine, as well as via telephone, facsimile and email from Thomas's Georgia offices.[21] This contract provided for the incorporation of Enterprises,[22] which would control the project.[23]

When the group neared an agreement to purchase the Sacramento

---

[19]     *See* Compl. ¶ 17; Affidavit of Stanley E. Thomas in Support of Defendants' Motion to Stay Discovery and to Dismiss the Complaint in this Action ¶ 9; May 6, 2004 Facsimile from Jeffrey F. Montgomery to Eric Levine, Ex. H to Levine Aff. ("Stan has asked that I respond to you on his behalf . . ."); May 10, 2004 Email from Graham Lacey to Eric Levine, Ex. G to Levine Aff. ("in the pursuit of Stan's interests . . .").

[20]     *See* Def. Mem. at 3-4 ("Since the execution of the [July 2004] Operating Agreement, Mr. Thomas has not initiated any email or facsimile communications with plaintiffs in New York, and he has placed only sporadic and limited telephone calls to Levine . . . .").

[21]     *See* Levine Aff. ¶¶ 12, 15-16; 2003 Memorandum of Agreement, Ex. A to Levine Aff.

[22]     This company's name was originally "Millennia Sacramento, III, LLC," but Thomas changed it to Thomas Enterprises of Sacramento, LLC, and eventually to S. Thomas Enterprises of Sacramento, LLC. *See* Compl. ¶¶ 5, 61-62.

[23]     *See id.* ¶¶ 19, 23.

property, Thomas's associate contacted Levine to begin negotiating a buy-out.[24]

These negotiations took place in New York — between Levine, Ross, and

Thomas's associate — as well as via telephone, email, and facsimile.[25]  Pursuant to

these negotiations, a second contract was executed in New York and served as a

provisional buy-out agreement until the final Operating Agreement of the

Company ("Operating Agreement") could be executed.[26]  The final Operating

Agreement was negotiated by telephone, facsimile and email between Levine and

Ross in New York and Thomas's representative in Atlanta.[27]

        The Operating Agreement, effective July 13, 2004, gave Thomas the

sole right to manage and control Enterprises.[28]  The agreement listed Enterprises's

primary place of business as Smyrna, Georgia.[29]  It contained a choice-of-law

provision providing that Delaware law would govern any dispute arising under the

---

[24]     *See* Levine Aff. ¶ 22.

[25]     *See id.* ¶¶ 23-24.

[26]     *See id.* ¶¶ 28-29.

[27]     *See id.* ¶ 29.

[28]     *See* Operating Agreement of Millennia Sacramento, III, LLC
("Operating Agreement"), Ex. C to Declaration of Edward R. Gallion, Esq., in
Support of Defendants' Motion to Stay Discovery and to Dismiss the Complaint in
this Action, § 5.1.

[29]     *See id.* § 2.3.

agreement.[30]  The Operating Agreement directed that payments to plaintiffs be deposited in a New York bank account,[31] and directed notices to be sent to Ross and Levine at their New York addresses.[32]  Thomas signed the Operating Agreement on behalf of himself and again on behalf of Enterprises.[33]

Although the Operating Agreement technically transferred control of the project to Thomas, Thomas and Levine agreed that Levine would continue to manage the project — coordinating discussions with Sacramento, receiving funds from Thomas, and paying the professional team — from New York.[34]  This arrangement continued for approximately one year, at which point Thomas's associate notified Levine that his services would no longer be needed.[35]  This

---

[30]     *See id.* § 16.3.

[31]     *See id.* §§ 17.11, 17.2A, 17.3; Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss and to Stay Discovery ("Opp. Mem.") at 15.

[32]     *See* Operating Agreement § 16.14; Ex. A to Operating Agreement.

[33]     *See* Operating Agreement at 26.

[34]     *See* Levine Aff. ¶¶ 34-35; July 21, 2004 Letter from Eric Levine to Stanley E. Thomas, Ex. G to Levine Aff. ("I will be pleased to serve as Project Leader to manage and coordinate on your behalf . . . .").

[35]     *See* Levine Aff. ¶ 40.

action was filed on June 19, 2009.

## III.   APPLICABLE LAW

### A.   Motion to Dismiss

Upon motion, a court must dismiss an action against a defendant over which it lacks personal jurisdiction.[36]  At the motion to dismiss stage, the plaintiff bears the burden of demonstrating that a court has jurisdiction over each defendant.[37]  Prior to discovery, this burden requires only that the plaintiff make a prima facie showing of jurisdiction "'by pleading in good faith legally sufficient allegations of jurisdiction.'"[38]  The plaintiff may prevail "notwithstanding a controverting presentation by the moving party," and conflicting facts are to be construed in a light most favorable to the plaintiff.[39]

### B.   Personal Jurisdiction

The determination of whether a court has personal jurisdiction over a

---

[36]     *See* Fed. R. Civ. P. 12(b)(2); *In re Ski Train Fire in Kaprun, Austria on November 11, 2000*, 230 F. Supp. 2d 403, 406 (S.D.N.Y. 2002).

[37]     *See In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 449, 452 (S.D.N.Y. 2005).

[38]     *Jazini v. Nissan Motor Co., Ltd.*, 148 F.3d 181, 184 (2d Cir. 1998) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)) (citations omitted).

[39]     *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79-80 (2d Cir. 1993).

8

defendant is a two-step process. *First*, "the court must look to the long-arm statute of the forum state."[40] *Second*, even if there is jurisdiction under the long-arm statute, the court must decide whether the exercise of that jurisdiction comports with the requirements of the Due Process Clause of the Constitution.[41]

### 1. New York Law

Plaintiffs allege personal jurisdiction under section 302 of the New York Civil Practice Law and Rules ("CPLR").[42] Subsection 302(a)(1) provides that a court may exercise personal jurisdiction over a non-resident defendant who, "in person or through an agent, transacts any business within the state or contracts anywhere to supply goods or services in the state." To establish personal jurisdiction pursuant to this subsection, a plaintiff must show that the defendant transacted business in New York and that the claim arises from that transaction.[43]

A non-domiciliary transacts business in New York when he

---

[40] *Bensusan Rest. Corp. v. King*, 126. F.3d 25, 27 (2d Cir. 1997) (citing *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997)).

[41] *See id.* (citing *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567-78 (2d Cir. 1996)).

[42] *See* Opp. Mem. at 2.

[43] *See Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996).

9

"purposely avails himself of the privilege of conducting activities within New York," thus invoking "the benefits and protections of its laws."[44]  In *Agency Rent A Car Systems v. Grand Rent A Car Corporation*, the United States Court of Appeals for the Second Circuit held that, when determining whether a defendant has transacted business in New York, courts should consider the totality of the circumstances while placing particular emphasis on the following factors:  (1) whether the defendant has an ongoing contractual relationship with a New York corporation; (2) whether the contract was negotiated or executed in New York; (3) whether a choice-of-law provision in that contract points to New York; and (4) whether the contract requires payments or notices to be sent to New York.[45]

A claim arises from a defendant's business transactions in New York when there exists a "substantial nexus" between the cause of action and the business transacted.[46]  In determining whether a substantial nexus exists between a claim for breach of contract and a defendant's business transactions, a court should consider, *inter alia*, the defendant's involvement with the negotiation and

---

[44]     *D.H. Blair & Co. v. Gottdiener*, 462 F.3d 95, 104-05 (2d Cir. 2006) (quoting *Parke-Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13, 18 (1970)).

[45]     *See* 98 F.3d at 29.

[46]     *See Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 60 (2d Cir. 1985).

10

execution of the contract.[47]   The defendant's physical presence in New York for

the final negotiation and execution is relevant, but is not necessary for a finding of

jurisdiction.[48]

## 2.    Due Process

The Fourteenth Amendment due process inquiry has two components:

*first*, the court must determine whether the defendant has had minimum contacts

with New York sufficient to justify the exercise of personal jurisdiction over the

defendant; and *second*, the court must determine whether the exercise of personal

jurisdiction is reasonable and thus comports with "'traditional notions of fair play

and substantial justice.'"[49]  "'The two prongs of the inquiry are interrelated, such

that a weak showing of minimum contacts requires a stronger demonstration of

reasonableness.'  The converse is also true."[50]

---

[47]     *See id.*

[48]     *See id.* ("[T]he case in which the defendant was physically present in
New York at the time the contract was made, in addition to sufficient other
contacts, is merely 'the clearest sort of case in which [New York] courts would
have 302 jurisdiction.'  The courts of New York have not indicated that they
consider their jurisdiction to be limited to such a 'clearest sort of case.'" (quoting
*Parke-Bernet Galleries, Inc.*, 26 N.Y.2d at 17)).

[49]     *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)
(quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

[50]     *Stolt Tankers B.V. v. Geonet Ethanol, LLC*, 591 F. Supp. 2d 612, 616
(S.D.N.Y. 2008) (quoting *Afloat in France, Inc. v. Bancroft Cruises Ltd.*, No. 03

The minimum contacts requirement ensures that a defendant is not haled into court "solely as a result of random, fortuitous, or attenuated contacts."[51] To establish the minimum contacts necessary to satisfy specific jurisdiction,

> "the plaintiff first must show that his claim arises out of or relates to defendant's contacts with the forum state. The plaintiff must also show that the defendant purposefully availed himself of the privilege of doing business in the forum state and that the defendant could foresee being haled into court there."[52]

If defendant's contacts with the forum state rise to this minimum level, a defendant may defeat jurisdiction only by presenting "a compelling case that the presence of some other considerations would render jurisdiction unreasonable."[53] The reasonableness factors include: (1) the burden imposed on the defendant by the exercise of personal jurisdiction; (2) the forum state's interest in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in efficient resolution; and (5) the

---

Civ. 917, 2003 WL 22400213, at *5 (S.D.N.Y. Oct. 21, 2003)).

[51]     *Burger King v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quotations omitted).

[52]     *Schottenstein v. Schottenstein*, No. 04 Civ. 5851, 2004 WL 2534155, at *7 (S.D.N.Y. Nov. 8, 2004) (quoting *Chew v. Dietrich*, 143 F.3d 24, 28 (2d Cir. 1998)).

[53]     *Burger King*, 471 U.S. at 477.

state's interest in promoting substantive social policies.[54]

### C.    Stay of Discovery

A trial court enjoys wide discretion to handle pre-trial discovery,[55] and may order a stay of discovery upon a finding of "good cause."[56]

## IV.   DISCUSSION

### A.    Personal Jurisdiction

#### 1.    New York Law

This Court's exercise of personal jurisdiction over Thomas and Enterprises is appropriate under subsection 302(a)(1) because plaintiffs' claims arise from business that Thomas transacted within New York State.  Consideration of the factors set forth in *Agency Rent A Car Systems* leads to the conclusion that Thomas and Enterprises have indeed "transacted business" within the meaning of subsection 302(a)(1).  Thomas and Enterprises have an ongoing contractual relationship with the New York plaintiffs that began in May of 2003.  The two

---

[54]    *See, e.g., Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 129 (2d Cir. 2002).

[55]    *See Wills v. Amerada Hess Corp.*, 379 F.3d 32, 51 (2d Cir. 2004) (citing *In re Fitch, Inc.*, 330 F.3d 104, 108 (2d Cir. 2003)).

[56]    Fed. R. Civ. P. 26(c); *Siemens Credit Corp. v. American Transit Ins. Co.*, No. 00 Civ. 0880, 2000 WL 534497, at *1 (S.D.N.Y. May 3, 2000).

contracts that led up to the current Operating Agreement were negotiated during various meetings in New York, and via frequent electronic, facsimile, and telephone contacts with New York by Thomas and his associates. Thomas agreed to provide funding for the Sacramento project, which was being run primarily out of New York. He came to meetings in New York, or sent representatives on his behalf, on at least nine occasions. Over the course of this business relationship, Thomas regularly wired money into a New York bank account for Levine to pay — on behalf of Enterprises — a variety of New York consultants and lawyers. The Operating Agreement also provides for payments and notices to be mailed to the New York plaintiffs. Although the Operating Agreement's choice-of-law provision requires the application of Delaware law, the totality of the circumstances leads to the conclusion that Thomas and Enterprises transacted business in New York.

Plaintiffs claim that Thomas and Enterprises breached the Operating Agreement. In determining whether this claim arises from Thomas's and Enterprises's business transactions in New York, it is relevant that defendants did not negotiate or execute the Operating Agreement in New York. However, the Operating Agreement was the third contract in a series of contracts that guided the parties' rights and responsibilities over the course of their business relationship.

14

Defendants' suggestion that this Court should consider only those negotiations which led directly to the execution of the Operating Agreement[57] is unpersuasive. The Operating Agreement was the product of a two-year business arrangement that was shaped by two prior contracts, both of which were negotiated in New York and one of which formed the substantial basis of the Operating Agreement. Because plaintiffs need to demonstrate only that their contract claims bear a "substantial nexus" to defendants' business transactions in New York, I will consider all of Thomas's and Enterprises's business activities that related directly to the Sacramento project. When viewed in this light, there is no doubt that plaintiffs' claims under the Operating Agreement arise from Thomas's and Enterprises's business transactions in New York.

### 2. Due Process

Thomas and Enterprises have had sufficient minimum contacts in New York to justify this Court's exercise of personal jurisdiction over them. Regardless of the fact that plaintiffs initially reached out to Thomas for his funds

---

[57]     *See* Defendants' Reply Memorandum of Law in Support of Their Motion to Stay Discovery and to Dismiss the Complaint in this Action at 2-3 ("Having chosen to sue exclusively on the Operating Agreement, plaintiffs must be held to the temporal and subject matter limitations imposed by their own pleadings. Defendants have never denied that any number of meetings took place in New York *after* the execution of the Operating Agreement . . . ." (emphasis added)).

15

and expertise, Thomas cannot deny that he has "purposefully availed himself of the privilege of doing business" with the New York plaintiffs. During the time that Levine functioned as Project Manager, New York was the project's home base. This was made possible by the funding that Thomas wired into New York, and Thomas should thus have foreseen being "haled into court" here.

Thomas and Enterprises have not made a compelling argument that the exercise of jurisdiction would be unreasonable. Defendants' own pleadings describe Thomas's "financial resources" as "vastly superior" to those of plaintiffs.[58] As a result, any burden that the exercise of jurisdiction would impose on defendants would be minimized. Moreover, New York has a compelling interest in enforcing a contract that was substantially negotiated within the state, and plaintiffs have an interest in obtaining convenient relief here in New York.

**B.     Stay of Discovery**

Given the decision on the motion to dismiss, there is no basis for a stay of discovery.

**V.     CONCLUSION**

For the reasons discussed above, defendants' motion to dismiss and request for a stay of discovery are denied. The Clerk of the Court is directed to

---

[58]     Def. Mem. at 4.

16

close this motion (document no. 13).  A conference is scheduled for February 25,

2010 at 4:30 p.m.


SO ORDERED:

Shira A. Scheindlin
U.S.D.J.


Dated:        New York, New York
              November 5, 2009

17

## - Appearances -

**For Plaintiffs:**

Gerald Padian, Esq.
Tashjian & Padian
15 West 36th Street, 15th Floor
New York, NY 10018
(212) 319-9800

**For Defendants:**

Edward R. Gallion, Esq.
Steven Spielvogel, Esq.
Gallion & Spielvogel LLP
75 Rockefeller Plaza, 18th Floor
New York, NY 10019
(212) 710-5160