UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- X

JOEL ROSS, ERIC LEVINE, and
JERDE DEVELOPMENT COMPANY,

      Plaintiffs,

    - against -

STANLEY E. THOMAS and S.
THOMAS ENTERPRISES OF
SACRAMENTO, LLC,

      Defendants.

------------------------------------------------------- X

**OPINION AND ORDER**

09 Civ. 5631 (SAS)



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/2/10

SHIRA A. SCHEINDLIN, U.S.D.J.:

## I. INTRODUCTION

Joel Ross, Eric Levine, and Jerde Development Company (formerly known as JPI Development Company) (collectively, the "Plaintiffs") bring this action against Stanley E. Thomas and S. Thomas Enterprises of Sacramento, LLC (the "Company") (collectively, the "Defendants"), alleging that the Defendants breached the terms of their July 13, 2004 Operating Agreement (the "Agreement") and that Thomas breached his guarantee of the Agreement. The Seventh and Eighth Causes of Action in the Plaintiffs' Second Amended Complaint allege that

the Defendants breached their obligations under the Agreement, and Thomas breached his personal guarantee of the Agreement, by failing to pay the Plaintiffs four million dollars upon the exercise of certain rights afforded to the Plaintiffs under the Agreement. On January 6, 2010, Defendants moved to dismiss Plaintiffs' Seventh and Eighth Causes of Action pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. On February 5, 2010, Plaintiffs moved for summary judgment on their Seventh and Eighth Causes of Action pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated below, Defendants' motion to dismiss is granted and Plaintiffs' motion for summary judgment is denied.

## II. BACKGROUND[1]

### A. The Project

In or about February 2002, the Plaintiffs agreed to collaborate in the acquisition and development of approximately 238 acres of land (the "Property") owned by Union Pacific Rail Yards ("Union Pacific") in Sacramento, California (the "Project").[2] In or about June 2002, the Plaintiffs reached an agreement with

---

[1] The following facts are presumed to be true for the purposes of deciding Defendants' motion to dismiss.

[2] See Compl. ¶¶ 12-13.

Thomas for Thomas to become the capital partner on the Project.[3]  In or about November 2002, Union Pacific selected the Plaintiffs, operating under the name Millennia Associates, LLC ("Millennia Associates"), as its preferred developer and awarded Millennia Associates the exclusive right to negotiate for the purchase of the Property.[4]

On May 20, 2003, Millennia Associates and Thomas' company, Thomas Enterprises, Inc., entered into a Memorandum of Agreement under which Millennia Associates agreed to transfer all its rights and contracts in the Project to a yet-to-be-formed limited liability company.[5]  On or about October 14, 2003, Millennia Associates entered into a Memorandum of Understanding with the City of Sacramento (the "City") regarding the Project.[6]  On or about April 29, 2004, the Plaintiffs and Thomas formed the Company.[7]  By May 2004, Union Pacific agreed

---

[3]  *See id.* ¶ 15.

[4]  *See id.* ¶ 18.

[5]  *See id.* ¶ 19.

[6]  *See id.* ¶ 22.

[7]  Initially the Company was called Millennia Sacramento, III, LLC. *See id.* ¶ 5.  Its name was changed to Thomas Enterprises of Sacramento, LLC and changed again to its present name, S. Thomas Enterprises of Sacramento, LLC. *See id.*

to the final terms for selling the Property to the Company.[8]

### B. The July 13, 2004 Operating Agreement

Thomas proposed that he buy out the Plaintiffs' interest in the Company.[9] On July 13, 2004, the Plaintiffs and the Defendants entered into the Agreement.[10] Under the Agreement, Thomas became the sole Member[11] and sole Manager[12] of the Company and the Plaintiffs became Economic Interest Owners.[13] The Agreement stated that it "shall be governed by and construed in accordance

---

[8]  *See id.* ¶ 25.

[9]  *See id.*

[10]  *See id.* ¶ 33.

[11]  *See* Operating Agreement of Millennia Sacramento, III, LLC ("Agreement") at 3, Ex. A to Compl. (defining "Member").

[12]  *See id.* (defining "Manager").

[13]  *See id.* at 2-3. The Agreement defines an "Economic Interest Owner" as "[t]he owner of an Economic Interest who is not a Member." *Id.* at 2. An "Economic Interest" is defined as
> [a]n Equity Owner's share of one or more of the Company's distributions and income tax items pursuant to this Agreement and the [Delaware Limited Liability Company] Act, but shall not include any right to participate in the management of the business and affairs in the Company, including any right to vote on, consent to[,] or otherwise participate in any decision of or by the Members or Manager.

*Id.* The term "Equity Owner" is defined to encompass both Economic Interest Owners and Members. *See id.*

with the laws of the State [of Delaware] . . . and specifically the [Delaware Limited Liability Company] Act."[14] The Agreement further provided that the Company would reach a point called Entitlement when

> (i) the Company has obtained from the City of Sacramento . . . program level land use approvals for the Project without Adverse Restrictions[15] evidenced by (a) the certificate of the City Council of a program level or master environmental impact report (or such similar document) under the California Environmental Quality Act, (b) the City Council's approval of amendments to the City's General Plan and the Central City Community Plan necessary for the Project and (c) the approval by the City Council and/or the City Redevelopment Agency of a master development agreement and/or owner participation agreement (or such similar document) for the Project and (ii) the period during which each such Project-related approvals [sic] may be administratively or judicially challenged or appealed has expired or, if challenged or appealed have been withdrawn or decided.[16]

---

[14] *Id.* at 1, 4, 19.

[15] The Agreement defines "Adverse Restrictions" as:
[a]ny restriction, or other term or condition, that would materially interfere with the construction, development, and operation of the Property or the Project in accordance with the Plans and Specifications, or leasing or sale of interests therein, or otherwise materially adversely affect the Property or the Project such that it is not economically feasible to develop sixty percent (60%) of the Plans and Specifications.

*Id.* at 1.

[16] *Id.* at 2.

The Agreement allocated one hundred Special Units to the Plaintiffs.[17] Special Units were "[t]he units of interest in the Company (that is, Ownership Interests)[18] issued to [the Plaintiffs]."[19] The Agreement gave the Plaintiffs the right to require the Company to purchase "the applicable portion of the Special Units indicated in the table, for the purchase price indicated in the table" ("Put Option").[20] The table indicated that "[f]rom and after the date the Company obtains Entitlement" the Plaintiffs have the Put Option to sell forty Special Units for the price of four million dollars.[21] "[F]rom and after the first anniversary of the date the Company obtains Entitlement[,]" the Plaintiffs have the Put Option to sell an additional twenty Special Units for two million dollars.[22] "[F]rom and after the second anniversary of the date the Company obtains Entitlement[,]" the Plaintiffs have the Put Option to sell a further twenty Special

---

[17]   See id. at 3.

[18]   See id. (defining "Ownership Interest").

[19]   Id. at 4.

[20]   Id. at 22.

[21]   Id.

[22]   Id.

Units for two million dollars.[23]  "[F]rom and after the third anniversary of the date the Company obtains Entitlement[,]" the Plaintiffs have the Put Option to sell their last twenty Special Units for two million dollars.[24]  Accordingly, the Agreement provided that after the Company obtained Entitlement, the Plaintiffs had the right to exercise their Put Options for a total of ten million dollars.[25]  Thomas guaranteed the payments for the Plaintiffs' exercise of their Put Options "jointly, severally, and primarily with the Company."[26]

### C. The Project-Related Approvals and the California Environmental Quality Act Proceedings

On December 11, 2007, the City approved the Railyards Specific Plan ("RSP") for the Project as well as a Development Agreement with the Company ("Development Agreement").[27]  Acting pursuant to the California Environmental Quality Act ("CEQA") the City also certified an Environmental Impact Report

---

[23]  *Id.*

[24]  *Id.*

[25]  The Agreement allowed for reductions in the purchase prices of the Special Units if the Company was unable to obtain approvals for specified amounts of office space, retail/commercial space, and residential units for the Project. *See id.* at 23.  Neither party alleges that these amounts were not met.

[26]  *Id.* at 25.

[27]  *See* Compl. ¶ 101.

("EIR") for the RSP.[28]  In May 2008, the Redevelopment Agency of the City approved and adopted a plan for the Railyards Redevelopment Area ("Railyards Redevelopment Plan"), a Master Owner Participation Agreement ("Master OPA"), and an Initial Phase Infrastructure Owner Participation Agreement (together with the RSP, the Development Agreement, the EIR, the Railyards Redevelopment Plan, and the Master OPA, the "Project-Related Approvals").[29]

Certain persons and entities (the "CEQA Petitioners") commenced actions in the Superior Court of California, County of Sacramento, challenging the adequacy of the Project-Related Approvals under CEQA (the "CEQA Proceedings").[30]  On November 10, 2009, the court denied the CEQA Petitioners' petitions (the "11/10/09 Ruling").[31]  All CEQA Petitioners filed timely notices of

---

[28]   *See id.*

[29]   *See id.* ¶ 102.

[30]   *See id.* ¶ 104; *Sacramento Citizens Concerned About the Railyard v. City of Sacramento* ("*SCCAR*"), No. 34-2008-00000504 (Cal. Super. Ct. filed Jan. 9, 2008); *Downtown Plaza, LLC v. City of Sacramento* ("*Downtown Plaza I*"), No. 34-2008-00000721 (Cal. Super. Ct. filed Jan. 10, 2008); *Castro v. City of Sacramento*, No. 34-2008-00012385 (Cal. Super. Ct. filed June 6, 2008); *Downtown Plaza, LLC v. Redevelopment Agency of the City of Sacramento* ("*Downtown Plaza II*"), No. 34-2008-00012956 (Cal. Super. Ct. filed June 11, 2008).

[31]   *See* Compl. ¶¶ 105-06; Ruling on a Submitted Matter, 11/10/09 Docket Entry, *SCCAR*, No. 34-2008-00000504; Ruling on a Submitted Matter, 11/10/09 Docket Entry, *Downtown Plaza I*, No. 34-2008-00000721; Ruling on a

appeal.[32]

On November 19, 2009, the Plaintiffs attempted to exercise their first Put Option.[33] On November 20, 2009, the Company and Thomas informed the Plaintiffs that the Company would not pay four million dollars in exchange for forty of the Plaintiffs' Special Units.[34]

## III. APPLICABLE LAW

### A. Motion to Dismiss

In deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must "accept as true all of the factual allegations contained in the complaint"[35] and "draw all reasonable inferences in

---

Submitted Matter, 11/10/09 Docket Entry, *Castro*, No. 34-2008-00012385; Ruling on a Submitted Matter, 11/10/09 Docket Entry, *Downtown Plaza II*, No. 34-2008-00012956.

[32]   *See* Notice of Appeal, 1/20/10 Docket Entry, *SCCAR*, No. 34-2008-00000504; Notice of Appeal, 2/9/10 Docket Entry; *Downtown Plaza I*, No. 34-2008-00000721; Notice of Appeal, 1/29/10 Docket Entry, *Castro*, No. 34-2008-00012385; Notice of Appeal, 2/5/10 Docket Entry, *Downtown Plaza II*, No. 34-2008-00012956.

[33]   *See* Compl. ¶ 108.

[34]   *See id.* ¶ 109.

[35]   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007). *Accord Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).

9

[the] plaintiff[s'] favor."[36] However, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations . . . a presumption of truthfulness."[37] To survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet a standard of "plausibility."[38] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[39] Plausibility "is not akin to a probability requirement," rather plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[40]

When determining the sufficiency of a claim under Rule 12(b)(6), the court is normally required to consider only the allegations in the complaint. However, the court is allowed to consider documents outside the pleading if the

---

[36] *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).

[37] *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotation marks omitted).

[38] *Twombly*, 550 U.S. at 564.

[39] *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quotation marks omitted).

[40] *Id.* (quotation marks omitted).

documents are integral to the pleading or subject to judicial notice.[41]

### B. Contract Interpretation Under Delaware Law[42]

"[T]he proper interpretation of language in a contract is a question of law."[43] Accordingly, "a motion to dismiss is a proper framework for determining the meaning of contract language."[44] "Delaware adheres to the objective theory of contract interpretation" under which "the court looks to the most objective indicia of [the parties'] intent: the words found in the written instrument."[45] "When the plain, common, and ordinary meaning of the words lends itself to only one

---

[41] *See Global Network Commc'ns, Inc. v. City of N.Y*, 458 F.3d 150, 156 (2d Cir. 2006).

[42] A federal court sitting in diversity applies the choice of law rules of the state in which it sits. *See Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 147 (2d Cir. 2008) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97 (1941)). Under New York Law, "[a]bsent fraud or a violation of public policy, a court is to apply the law selected in the contract as long as the state selected has sufficient contacts with the transaction." *Fieger v. Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001). Neither party disputes the applicability of the Agreement's choice of law provision. Accordingly, Plaintiffs' contract claims are governed by Delaware law. *See* Agreement at 19.

[43] *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).

[44] *Majkowski v. American Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 581 (Del. Ch. 2006).

[45] *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 461 (Del. Ch. 2008).

reasonable interpretation, that interpretation controls the litigation."[46] If the language in the contract "is clear and unambiguous on its face" courts may not "consider parol evidence to interpret it or search for the parties' intentions."[47] Contract terms are not rendered ambiguous simply because the parties disagree as to their construction.[48] Contract terms are only ambiguous "[w]hen the provisions in controversy are fairly susceptible [to] different interpretations or may have two or more different meanings."[49]

---

[46] *Id.* (citing *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)).

[47] *Pellaton v. Bank of N.Y.*, 529 A.2d 473, 478 (Del. 1991).

[48] *See Rhone Poulenc Basic Chem. Co. v. American Motorist Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).

[49] *Eagle Indus., Inc.*, 702 A.2d at 1232.

## IV. DISCUSSION[50]

Defendants argue that they did not breach their obligations under the Agreement, and Thomas did not breach his personal guarantee of the Agreement, by failing to honor Plaintiffs' attempt to exercise their Put Option because the conditions precedent to such exercise have not been met.[51] Specifically, Defendants assert that Plaintiffs cannot exercise their Put Option because the

---

[50] In deciding the Defendants' motion to dismiss, I considered the Agreement, which was attached to the Complaint, as well as publicly filed documents related to the CEQA Proceedings. *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("Documents that are attached to the complaint . . . are deemed part of the pleading and may be considered [on a Rule 12(b)(6) motion]."); *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (concluding that a judge may "look to public records, including complaints filed in state court, in deciding a motion to dismiss"). Defendants submitted an Affidavit with their Memorandum of Law in Support of Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Def. Mem.") and another with the Defendants' Reply Memorandum of Law in Further Support of their Motion to Dismiss, Pursuant to Federal Rule of Civil Procedure 12(b)(6), and in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Reply"). Plaintiffs submitted an affidavit with Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss and in Support of Plaintiffs' Motion for Partial Summary Judgement ("Opp. Mem."). I did not consider these affidavits when deciding the Defendants' Motion to Dismiss. *See Friedl v. City of New York*, 210 F.3d 79, 83-84 (2d Cir. 2000) ("[A] district court errs when it considers affidavits and exhibits submitted by defendants or relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss." (quotation marks and citations omitted)).

[51] *See* Def. Mem. at 4.

Company has not obtained Entitlement.[52] Obtaining Entitlement requires that "the period during which [the relevant] Project-related approvals may be administratively or judicially challenged or appealed has expired or, if challenged or appealed have been withdrawn or decided."[53] Defendants argue that this criterion had not been met because, at the time Plaintiffs attempted to exercise their Put Option, the time for appealing the 11/10/09 Ruling in the CEQA Proceedings had not expired.[54] Now that the CEQA Petitioners have filed timely notices of appeal from the 11/10/09 Ruling, the Defendants argue that the challenge to the Project-Related Approvals has not been decided within the meaning of the Agreement.[55]

Plaintiffs assert that the 11/10/09 Ruling decided the appeals of the Project-Related Approvals within the meaning of the Agreement because any further appeals in the CEQA Proceedings are appeals of the 11/10/09 Ruling, not the Project-Related Approvals themselves.[56] Plaintiffs argue that if the

---

[52] *See id.* at 3-4.

[53] Agreement at 4.

[54] *See* Def. Mem. at 4.

[55] *See* Reply at 4.

[56] *See* Opp. Mem. at 13.

Agreement's definition of Entitlement encompassed appeals from the California Superior Court's rulings, "it would have used such obvious phrases as 'final, non-appealable disposition' or 'all possible appeals decided.'"[57]

Even viewed in the light most favorable to Plaintiffs, the Agreement is not susceptible to the interpretation they suggest. The CEQA Petitioners' judicial challenge to the Project-Related Approvals is clearly ongoing and accordingly has not been "decided" within the ordinary meaning of the word.[58] The Plaintiffs' argument that the CEQA Petitioners are appealing the 11/10/09 Ruling and not the Project-Related Approvals is unconvincing considering that the Project-Related Approvals remain in jeopardy. Appealing the 11/10/09 Ruling is part of the process of appealing the Project-Related Approvals.

The conclusion that obtaining Entitlement under the Agreement requires a final decision on a judicial challenge to the Project-Related Approvals is strengthened when considering the purpose of the provision in which the word

---

[57] *Id.* at 12.

[58] *Cf. Rhone-Poulenc Basic Chemicals Co.*, 616 A.2d at 1195 ("Absent some ambiguity, Delaware courts will not destroy or twist [contract] language under the guise of construing it."); *Allied Capital Corp.*, 910 A.2d at 1030 ("When the language of a contract is plain and unambiguous, binding effect should be given to its evident meaning.").

"decision" appears.[59] The clear purpose of requiring "the period during which [the relevant] Project-related approvals may be administratively or judicially challenged or appealed [to] expire[] or, if challenged or appealed [be] withdrawn or decided" is to ensure that the Company has obtained the Project-Related Approvals on a reasonably permanent basis. The Plaintiffs' interpretation of the word "decided" vitiates this purpose by allowing the Company to obtain Entitlement before the Company can rely on the Project-Related Approvals.

The Plaintiffs additionally argue that, in the event I agree with the Defendants' interpretation of the definition of Entitlement, "[f]iling a notice of appeal is not the same as having 'appealed'" and therefore "the Court should hold-off on dismissing [their] Seventh and Eighth Causes of Action until it is clear that the [11/10/09 Ruling] ha[s] indeed been appealed."[60] This argument also lacks merit. The fact that all the CEQA Petitioners filed notices of appeal is sufficient evidence that they intend to appeal the 11/10/09 Ruling and that the CEQA Proceedings have not been concluded. Accordingly, there is no reason to refrain from dismissing the Plaintiffs' Seventh and Eighth Causes of Action.

---

[59] *Cf. Comet Systems, Inc. Shareholders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1031 (Del. Ch. 2008) (considering the purpose of the disputed contract term in construing its meaning).

[60] Opp. Mem at 16.

## V. CONCLUSION

For the foregoing reasons the Defendants' motion to dismiss is granted. Plaintiffs' Seventh and Eight Causes of Action are dismissed without prejudice to refile if Defendants refuse to honor the exercise of Plaintiffs' Put Option after the Company has obtained Entitlement. Because I conclude that the Plaintiffs' Seventh and Eighth Causes of Action should be dismissed, Plaintiffs' motion for summary judgment on these causes of action is denied. The Clerk of the Court is directed to close these motions (Docket Nos. 34 and 42). A conference is scheduled for March 9, 2010 at 4:30 p.m.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           March 1, 2010

- Appearances -

**For Plaintiffs:**

Gerald Padian, Esq.
Bradley M. Rank, Esq.
Howard M. Raber, Esq.
Tashjian & Padian
15 West 36th Street, 15th Floor
New York, NY 10018
(212) 319-9800

**For Defendants:**

Edward R. Gallion, Esq.
Steven Spielvogel, Esq.
Gallion & Spielvogel LLP
75 Rockefeller Plaza, 18th Floor
New York, NY 10019
(212) 710-5160