**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------- X

**JOEL ROSS, ERIC LEVINE, and
JERDE DEVELOPMENT COMPANY,**

                **Plaintiffs,**

      **- against -**

**STANLEY E. THOMAS and S.
THOMAS ENTERPRISES OF
SACRAMENTO, LLC,**

           **Defendants.**

-------------------------------------------------- X

**OPINION AND ORDER**

**09 Civ. 5631 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 7/15/10

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

**I.    INTRODUCTION**

      Joel Ross, Eric Levine, and Jerde Development Company (f/k/a JPI

Development Company) (collectively, "Plaintiffs") bring this action against

Stanley E. Thomas and S. Thomas Enterprises of Sacramento, LLC (the

"Company") (collectively, "Defendants").  Plaintiffs contend that both Defendants

breached the terms of, and Thomas breached his guarantee of, their July 13, 2004

Operating Agreement (the "Agreement") by, *inter alia*, failing to pay ten million

dollars in equity distributions as required by section 10.2 of the Agreement.  On

April 16, 2010, Plaintiffs moved for partial summary judgment on their First and

Second Causes of Action pursuant to Rule 56(b) of the Federal Rules of Civil

Procedure.  For the reasons stated below, Plaintiffs' motion is granted.

## II.   BACKGROUND[1]

### A.   The Project

In February 2002, Plaintiffs agreed to collaborate in the  acquisition

and development of approximately 238 acres of land (the "Property") owned by

Union Pacific Rail Yards ("Union Pacific") in Sacramento, California (the

"Project").[2]  In June 2002, Plaintiffs reached an agreement with Thomas for

Thomas to become the capital partner on the Project.[3]  In November 2002, Union

Pacific selected Plaintiffs, operating under the name Millennia Associates, LLC

("Millennia Associates"), as its preferred developer and awarded Millennia

---

[1]      The following facts are drawn from Plaintiffs' Statement of Material
Facts in Support of the Motion for Summary Judgment ("Pl. 56.1") and
Defendants' Response to Plaintiffs' Statement of Material Facts in Support of the
Motion for Summary Judgment ("Def. 56.1"), and from the evidence submitted to
this Court with respect to this motion.  Some undisputed background facts not
material to this motion have been taken from the Second Amended Complaint
("SAC").

[2]      *See* SAC ¶¶ 12-13.

[3]      *See id.* ¶ 15.

Associates the exclusive right to negotiate for the purchase of the Property.[4]

Millennia Associates and Thomas's company, Thomas Enterprises, Inc., entered into a May 20, 2003 Memorandum of Agreement under which Millennia Associates agreed to transfer all of its rights and contracts in the Project to a yet-to-be-formed limited liability company.[5]  On October 14, 2003, Millennia Associates entered into a Memorandum of Understanding with the City of Sacramento (the "City") regarding the Project.[6]  On April 29, 2004, Plaintiffs and Thomas formed the Company.[7]  On June 6, 2004, the parties entered into a second Memorandum of Agreement, under which Plaintiffs agreed to transfer control of the Company to Thomas in exchange for an unconditional payment of $500,000 and certain non-voting "economic rights."[8]

---

[4]     See id. ¶ 18.

[5]     See id. ¶ 19.

[6]     See id. ¶ 22.

[7]     See id. ¶¶ 5, 23.  Initially the Company was called Millennia Sacramento, III, LLC. See Operating Agreement of Millennia Sacramento, III, LLC ("Agreement"), Ex. A to Affidavit of Gerald Padian, counsel for Plaintiffs, in Support of Motion for Summary Judgment ("Padian Aff."). The Company changed its name to Thomas Enterprises of Sacramento, LLC, and then changed to its present name, S. Thomas Enterprises of Sacramento, LLC. See First Amendment to Agreement, Ex. B to Padian Aff.; Amendment No. 2 to Agreement, Ex. B to Padian Aff.

[8]     See SAC ¶¶ 26, 29.

3

**B.      The July 13, 2004 Agreement**

On July 13, 2004, Plaintiffs and Defendants entered into the

Agreement, through which Thomas purchased Plaintiffs' interest in the Company.[9]

Under the terms of the Agreement, Thomas became the sole Member[10] and sole

Manager[11] of the Company and Plaintiffs became Economic Interest Owners.[12]

The Agreement stated that it "shall be governed by and construed in accordance

with the laws of the State [of Delaware] . . . and specifically the [Delaware

Limited Liability Company] Act."[13]

---

[9]      *See* Pl. 56.1 ¶ 1; Def. 56.1 ¶ 1.

[10]     *See* Agreement at 3 (defining "Member").

[11]     *See id.* (defining "Manager").

[12]     *See id.* at 2-3.  The Agreement defines an "Economic Interest Owner" as "[t]he owner of an Economic Interest who is not a Member."  *Id.* at 2.  An "Economic Interest" is defined as

> [a]n Equity Owner's share of one or more of the Company's distributions and income tax items pursuant to this Agreement and the [Delaware Limited Liability Company] Act, but shall not include any right to participate in the management of the business and affairs in the Company, including any right to vote on, consent to[,] or otherwise participate in any decision of or by the Members or Manager.

*Id.*  The term "Equity Owner" is defined to encompass both Economic Interest Owners and Members.  *See id.*

[13]     *Id.* at 1, 4, 19.

4

The Agreement allocated to Plaintiffs one hundred Special Units in

the Company, which gave them an ownership interest in the Company.[14]  Pursuant

to section 10.2 of the Agreement, Plaintiffs were entitled to cash distributions in

exchange for their shares of equity ownership if certain conditions precedent were

met:

> The Company shall distribute in cash to [Plaintiffs] . . . the
> Applicable Percentage (defined below) of the amount, if
> any, by which the aggregate Net Cash Flow from
> Operations[15] and Gross Capital Proceeds[16] received by the
> Company, any Equity Owner, or any of their respective
> Affiliates through the date of determination exceeds the
> aggregate Acquisition and Development Expenses[17]

---

[14]    *See id.* at 3 (defining "Ownership Interest").  Special Units are
defined as "[t]he units of interest in the Company (that is, Ownership Interests)
issued to [Plaintiffs]." *Id.* at 4.

[15]    The Agreement defines "Net Cash Flow from Operations" as "[t]he
Company's cash receipts from operations of the Company, less the amount of the
Company's operating expenses." *Id.* at 3.

[16]    The Agreement defines "Gross Capital Proceeds" as "[t]he gross
proceeds of a Capital Transaction, less the expenses incurred by the Company, an
Equity Owner, and any of their respective Affiliates in connection with the
negotiation, preparation, and execution of the transactional documents and in
connection with the consummation of the transaction . . . ." *Id.*  The term "Capital
Transaction" is defined as "[a] sale or other transfer, or a financing or refinancing,
of all or any portion of the Real Property or the Project . . . ." *Id.* at 2.

[17]    The Agreement defines "Acquisition and Development Expenses" as
"[t]he direct costs of acquiring and developing the Real Property and the Project,
including the following expenses: (i) the purchase price for the Real Property and
other direct expenses incurred in connection with the acquisition of the Real

5

incurred by the Company, any Equity Owner, or any of their respective Affiliates through the Date of Determination.[18] The portion of such excess amount shall be payable to [Plaintiffs] as and when such excess amount is received, being the Date of Determination.[19]

The "Applicable Percentage" of the excess funds payable to Plaintiffs is defined as

"0.225% per Special Unit outstanding at the time in question."[20] Thomas

guaranteed the payments due to the Plaintiffs "jointly, severally, and primarily

with the Company."[21]

## C. The Company's Capital Transactions

On December 29, 2006, the Company acquired title to the Property

---

Property, including attorneys' fees, travel expenses, and other expenses incurred in connection with the negotiation, preparation, and execution of the transactional documents and in connection with the consummation of the acquisitions . . . and (ii) direct expenses incurred in connection with the development of the Real Property and the Project . . . ." *Id.* at 1.

[18]     The Agreement defines "Date of Determination" as "[t]he closing date of any material financing, refinancing, equity investment in the Company, material transfer of any assets of the Company or a sale of land or any other material assets." *Id.* at 2.

[19]     *Id.* at 14 ("Certain Excess Amounts"). Pursuant to § 17.3.2 of the Agreement, ten million dollars was the maximum aggregate purchase price for Plaintiffs' Special Units. *Id.* at 23.

[20]     *Id.* at 14. The Agreement explained that, pursuant to these terms, the initial Applicable Percentage would be 22.5% (0.225% of 100 Special Units). *See id.*

[21]     *Id.* at 25.

6

from Union Pacific for approximately seventy-four million dollars, roughly

sixteen million of which was in the form of a promissory note.[22]  As part of the

same deal, the Company sold a portion of the Property known as "Parcel A" to the

City for fifty-five million dollars – thirty million dollars in cash and a promissory

note worth twenty-five million dollars.[23]  The Company then sold the City's

promissory note to Bank of America for twenty-five million dollars in cash,[24] and

forwarded that money to Union Pacific as part of the purchase price of the

Property.[25]

　　　　　The Company also secured two Loans from IA Sacramento Rail,

LLC, an affiliate and/or subsidiary of Inland America Real Estate Trust, Inc.

---

[22]     *See* 6/16/05 Purchase and Sale Agreement and Escrow Instructions between Union Pacific and the Company, Ex. C to Padian Aff.; 12/28/06 Promissory Note Secured by Deed of Trust from the Company to Union Pacific ("12/28/06 Note"), Ex. D to Padian Aff.

[23]     *See* 4/3/07 Email from Jeffrey M. Montgomery, counsel for Defendants, to Charles Benvenuto ("Montgomery Email"), Ex. E to Padian Aff.; 12/28/06 Promissory Note Secured by Deed of Trust from the City to the Company, Ex. D to Padian Aff.

[24]     *See* 12/28/06 Note Purchase Agreement among Bank of America, the City and the Company, Ex. D to Padian Aff.

[25]     *See* Montgomery Email.

7

("Inland"): one in April 2007 for $125 million,[26] and the second in August 2008

for $50.35 million (collectively the "Loans").[27]  The first loan was collateralized in

part by encumbering the Property with a Deed of Trust, which granted Inland a

security interest in the premises.[28]  Thomas also personally guaranteed repayment

of the loan, and the Company offered a corporate guarantee.[29]  As additional

collateral for the second loan, Thomas offered some of his personal assets,

including four shopping centers he owned in various locations around the country

---

[26]     *See* 4/26/07 Memorandum from Joe Cosenza, Authorized Agent for
Inland ("Cosenza Mem."), Ex. I to Padian Aff.; 4/26/07 Loan Funding Statement,
Ex. I to Padian Aff.  The $125 million loan included roughly $19.4 million in
interest reserves, a one-time fee of $1.25 million, and a $2.2 million withholding
for additional environmental work that might be required, which left $102 million
to the Company in net funding. *See* 4/26/07 Loan Funding Statement.

[27]     *See* 8/29/08 Loan Funding Statement, Ex. J to Padian Aff.  The
$50.35 million figure included $350,000 in transaction costs, leaving the Company
with fifty million dollars in net proceeds from the second loan.  The actual cost of
closing was $354,081.51, but the Funding Statement stipulated that costs in excess
of $350,000 would be paid by the Borrower out of his loan proceeds. *See* 8/29/08
Funding Statement; Deposition of Cosenza ("Cosenza Dep."), attached to 7/5/10
letter to the Court from Edward R. Gallion, Counsel to Defendants.  Plaintiffs
calculate the closing costs to be $945,754, leaving $49,404,246 in net proceeds,
but it is unclear how they arrive at that figure. *See* Pl. 56.1 ¶ 9; Affidavit of Joel
Ross in Support of Motion for Summary Judgment ("Ross Aff.")  ¶¶ 23-24.

[28]     *See* 4/26/07 Promissory Note by the Company to IA Sacramento Rail,
LLC ("4/26/07 Inland Note") at 6, Ex. J to Padian Aff.; 5/5/10 Affidavit of Stanley
E. Thomas in Opposition to Plaintiffs' Motion for Partial Summary Judgment
("Thomas Aff.") ¶ 12.

[29]     *See* Cosenza Mem.; Thomas Aff. ¶ 12.

(one in Georgia, one in Alabama, and two in California), as well as his 9,700-acre ranch in Sarasota, Florida.[30]  The new loan was cross-defaulted with the original loan to enhance the security guarantee.[31]  While the Loans were secured in large part by the Property, Inland did not specify or restrict how the loan proceeds were to be spent.[32]

### D.    Procedural History

On June 19, 2009, Plaintiffs filed this diversity action alleging breach of contract against both Defendants and breach of guarantee against Thomas.[33] Plaintiffs sought damages in excess of ten million dollars and a declaratory judgment entitling them to inspect various Enterprises records.[34]  On August 14, 2009, Defendants moved to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, and requested a stay of discovery pursuant to Rule 26(c).  By opinion and order dated November 5, 2009,

---

[30]     *See* Benvenuto Mem, at 2-3, Ex. K to Padian Aff.; Def. 56.1 ¶ 5.

[31]     *See* Benvenuto Mem. at 1; Affidavit of Mark E. Berg, expert witness for Defendants, in Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Berg Aff.") ¶ 9.

[32]     *See* 4/26/07 Inland Note; Thomas Aff. ¶ 14.

[33]     *See* SAC ¶¶ 1, 8.

[34]     *See id.* ¶¶ 110, 135.

9

both motions were denied.[35]

On January 6, 2010, Defendants filed a motion to dismiss Plaintiffs'

Seventh and Eighth Causes of Action pursuant to Rule 12(b)(6) of the Federal

Rules of Civil Procedure. In response, Plaintiffs moved for summary judgment on

those two claims on February 5, 2010. This Court granted Defendants' motion to

dismiss and denied Plaintiffs' motion for summary judgment by opinion and order

dated March 2, 2010.[36] Six weeks later, on April 16, 2010, Plaintiffs moved for

summary judgment on their First and Second Causes of Action pursuant to Rule

56 of the Federal Rules of Civil Procedure.

## III.   APPLICABLE LAW

### A.   Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of

law."[37] "'An issue of fact is genuine if the evidence is such that a reasonable jury

---

[35]    *See Ross v. Thomas*, No. 09 Civ. 5631, 2009 WL 3698024 (S.D.N.Y.
Nov. 5, 2009).

[36]    *See Ross v. Thomas*, No. 09 Civ. 5631, 2010 WL 743912 (S.D.N.Y.
Mar. 2, 2010).

[37]    Fed. R. Civ. P. 56(c).

10

could return a verdict for the nonmoving party.  A fact is material if it might affect

the outcome of the suit under the governing law.'"[38]  "[T]he burden of

demonstrating that no material fact exists lies with the moving party . . . ."[39]

"When the burden of proof at trial would fall on the nonmoving party, it ordinarily

is sufficient for the movant to point to a lack of evidence to go to the trier of fact

on an essential element of the non[-]movant's claim."[40]

      To defeat a motion for summary judgment, the non-moving party

must raise a genuine issue of material fact.[41]  The non-moving party must do more

than show that there is "'some metaphysical doubt as to the material facts,'"[42] and

it "'may not rely on conclusory allegations or unsubstantiated speculation.'"[43]

---

[38]    *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008)).

[39]    *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (citing *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007)).

[40]    *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

[41]    *See id.*

[42]    *Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) (quoting *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

[43]    *Jeffreys v. City of N.Y.*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Fujitsu Ltd. v. Federal Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001)).  *Accord* Fed. R. Civ. P. 56(e) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided

11

However, "'all that is required [from a non-moving party] is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"[44]

In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in that party's favor.[45]  However, "'only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.'"[46]  "'Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.'"[47]  Summary judgment is

in this rule – set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.").

[44]   *Kessler v. Westchester County Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986)).

[45]   *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009) (citing *Anderson*, 477 U.S. at 247-50, 255).

[46]   *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009) (quoting *Raskin v. Wyatt Co.*, 125 F.3d 55, 65 (2d Cir. 1997)).

[47]   *McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997)).

therefore "appropriate only if there is no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law."[48]

## B. Contract Interpretation Under Delaware Law[49]

"[T]he proper interpretation of language in a contract is a question of

law."[50] "Summary judgment is an appropriate process for the enforcement of

unambiguous contracts because there is no material dispute of fact for the court to

resolve."[51] "Delaware adheres to the objective theory of contract interpretation"

under which "the court looks to the most objective indicia of [the parties'] intent:

---

[48]    *Pyke v. Cuomo*, 567 F.3d 74, 76 (2d Cir. 2009).

[49]    A federal court sitting in diversity applies the choice of law rules of
the state in which it sits. *See Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 147
(2d Cir. 2008) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97
(1941)). Under New York Law, "[a]bsent fraud or a violation of public policy, a
court is to apply the law selected in the contract as long as the state selected has
sufficient contacts with the transaction." *Fieger v. Pitney Bowes Credit Corp.*,
251 F.3d 386, 393 (2d Cir. 2001). Neither party disputes the applicability of the
Agreement's choice of law provision, which designates Delaware law as
controlling. Accordingly, Plaintiffs' contract claims are governed by Delaware
law. *See* Agreement at 19.

[50]    *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030
(Del. Ch. 2006).

[51]    *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1030
(Del. Ch. 2008) (citation omitted).

the words found in the written instrument."[52]  "When the plain, common, and
ordinary meaning of the words lends itself to only one reasonable interpretation,
that interpretation controls the litigation."[53]  If the language in the contract "is
clear and unambiguous on its face" courts may not "consider parol evidence to
interpret it or search for the parties' intentions."[54]

Contract terms are not rendered ambiguous simply because the parties
disagree as to their construction.[55]  "A trial judge must review a contract for
ambiguity through the lens of 'what a reasonable person in the position of the

---

[52]     *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 461 (Del. Ch.
2008).  *Accord Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228,
1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be
used to interpret the intent of the parties, to vary the terms of the contract or to
create an ambiguity.").

[53]     *Sassano*, 948 A.2d at 461 (citing *Eagle*, 702 A.2d at 1232).  *Accord
AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. Super. 2008) ("'Delaware courts
will not destroy or twist [contract] language under the guise of construing it. When
the language of a . . . contract is clear and unequivocal, a party will be bound by its
plain meaning because creating an ambiguity where none exists could, in effect,
create a new contract with rights, liabilities and duties to which the parties had not
assented . . . .'" (quoting *Lorillard Tobacco Co. v. American Legacy Found.*, 903
A.2d 728, 739 (Del. 2006); *Rhone-Poulenc Basic Chem. Co. v. American Motorist
Ins. Co.*, 616 A.2d 1192, 1195-96 (Del. 1992))).

[54]     *Pellaton v. Bank of N.Y.*, 592 A.2d 473, 478 (Del. 1991).

[55]     *See Rhone-Poulenc*, 616 A.2d at 1196.

14

parties would have thought the contract meant.'"[56]  Contract terms are only

ambiguous "[w]hen the provisions in controversy are fairly susceptible [to]

different interpretations or may have two or more different meanings."[57]

When faced with an ambiguous contract provision, "the interpreting

court must look beyond the language of the contract to ascertain the parties'

intentions" at the time of drafting.[58]  In making such a determination, "the court []

may consider objective [parol] evidence, 'including the overt statements and acts

of the parties, the business context, the parties' prior dealings, and industry

custom.'"[59]  "[W]here a contract provision lends itself to two interpretations, a

court will not adopt [an] interpretation that leads to unreasonable results, but

instead will adopt the construction that is reasonable and that harmonizes the

affected contract provisions."[60]  "An unreasonable interpretation produces an

---

[56]    *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396
(Del. Super. 2010) (quoting *Rhone-Poulenc*, 616 A.2d at 1197).

[57]    *Eagle Indus.*, 702 A.2d at 1232.

[58]    *Id.*

[59]    *Julian v. Julian*, No. 1892-VCP, 2010 WL 1068192, at *5 (Del. Ch.
Mar. 22, 2010) (quoting *Concord Steel, Inc. v. Wilmington Steel Processing Co.*,
No. 19035, 2009 WL 3161643, at *6 (Del. Ch. Sept. 30, 2009)).

[60]    *Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del.
Super. 2010) (citing Restatement (Second) of Contracts § 203 (1981); *Lorillard*,
903 A.2d 728; *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 288 (Del. 2001);

absurd result or one that no reasonable person would have accepted when entering the contract."[61]

There are three elements to a breach of contract claim under Delaware law. To be entitled to summary judgment, "Plaintiffs must prove that a contract existed; they must establish that the defendant breached an obligation imposed by the contract; and they must show that the breach resulted in damages."[62]

## IV.  DISCUSSION

### A.  Contract Interpretation

According to the section 10.2 of the Agreement, Plaintiffs are owed cash distributions when the Company takes in more capital than it has expended in connection with the Project.[63]  Plaintiffs allege that these conditions for payment were met on April 26, 2007, when the Company secured the $125 million Inland loan. Based on the Company's tax and other financial records,[64] Plaintiffs contend

---

and *Holland v. National Auto. Fibres*, 194 A. 124, 127 (Del. Ch. 1937)).

[61]     *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. Super. 2010) (citations omitted).

[62]     *Millett v. TrueLink, Inc.*, 533 F. Supp. 2d 479, 487-88 (D. Del. 2008) (citing *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003)).

[63]     *See* Agreement at 14.

[64]     Plaintiffs rely on (1) an affidavit by Elliot A. Lesser, C.P.A., reviewing Defendants' federal and state tax returns from 2006, 2007, and 2008,

that the combined Gross Capital Proceeds from the sale of Parcel A to the City, the

sale of the twenty-five million dollar promissory note to Bank of America, and the

procurement of financing from Inland was in excess of $175 million.[65]  Taking the

fifty-five million dollars forwarded to Union Pacific into account as well as the

Company's other expenditures in connection with the Project, the Acquisition and

Development Expenses as of April 26, 2007 totaled nearly $120 million.[66]

Although the Project was operating at a loss of more than eight million dollars at

the time,[67] the aggregate Net Cash Flow from Operations and Gross Capital

Proceeds received by the Company still exceeded the Company's accumulated

Acquisition and Development Expenses by roughly $47.5 million, according to

Plaintiffs' calculations.[68]  Consequently, Plaintiffs argue, they were entitled to the

---

the Company's 2007 and 2008 Balance Sheet and Income Statement, and
Thomas's Personal Financial Statements to determine the Net Cash Flow from
Operations, Gross Capital Proceeds, and Acquisition and Development Expenses
as defined by the Agreement ("Lesser Aff."); and (2) the Ross Affidavit, which
sets out the history of dealings between the parties and the Plaintiffs' alleged
entitlement to distributions under the Agreement.

[65]     *See* Pl. 56.1 ¶¶ 4-6; Lesser Aff. ¶¶ 13-14.

[66]     *See* Lesser Aff. ¶¶ 16-19.

[67]     The Net Cash Flow from Operations was -$8,043,651 as of December
31, 2007. *See id.* ¶¶ 12, 15.

[68]     The Gross Capital Proceeds of roughly $175 million plus the Net
Cash Flow from Operations of negative eight million dollars amounted to $167

Applicable Percentage (22.5%) of that excess capital.[69]

Plaintiffs further contend that, although they should have been paid as of April 26, 2007, they were also due distributions as of August 29, 2008, when the Company received the second Inland loan.[70] On that date, the aggregate Gross Capital Proceeds and the Net Cash Flow from Operations exceeded the Company's Acquisition and Development Expenses for the Project by over ninety-five million dollars.[71]

---

million – roughly $47.5 million more than the Company's $120 million in Acquisition and Development Expenses. *See* Pl. 56.1 ¶¶ 7-8; Lesser Aff. ¶¶ 4, 19.

[69]    In theory, Plaintiffs would be entitled to 22.5% of the $47.5 million net excess under section 10.2, which amounts to more than $10.6 million. The Agreement, however, limits the value of Plaintiffs' equity interest to ten million dollars; Plaintiffs are entitled, if at all, to a maximum of ten million dollars in distributions. Plaintiffs concede as much, and claim only for that amount with interest. *See* Lesser Aff. ¶ 4.

[70]    *See* Ross Aff. ¶ 5.

[71]    Based on the Company's 2008 Federal Tax Returns, Plaintiffs estimate the Net Cash Flow from Operations to be roughly negative nineteen million dollars. Combining the net proceeds from both Inland Loans and the sale of Parcel A to the City, Plaintiffs calculate that the Gross Capital Proceeds as of August 29 were $224.7 million. Plaintiffs contend that the Company's Acquisition and Development Expenses amounted to $110 million, leaving a balance of over ninety-five million dollars when subtracted from the aggregate Net Cash Flow from Operations and Gross Capital Proceeds. *See* Lesser Aff. ¶¶ 22-28.

### 1.    Timeliness of Plaintiffs' Claim

Defendants argue, in essence, that Plaintiffs' claims for distributions under section 10.2 are premature because the Agreement "never contemplated that Plaintiffs would be entitled to any kind of a payout until and unless the Project had been developed to a viable, income-generating entity."[72]  They challenge Plaintiffs' interpretation of the contract as "nonsensical" when read in the context of the large-scale real estate development business.[73]  Based on his experience in the field, Thomas contends that no bank or lending institution would ever fund a development project if third parties were automatically entitled to a percentage of the loan proceeds "off the top."[74]  He claims he would never have agreed to the contract if, by its terms, Plaintiffs could demand distributions before the Company had been given adequate time to develop the Project.[75]

Although Defendants contend that "logic" and the "day-to-day realities attendant to the financing of large-scale real estate development projects" demand that the contract be construed as implying a condition precedent to

---

[72]     Thomas Aff. ¶ 11.

[73]     *Id.* ¶ 9.

[74]     *Id.* ¶ 11.

[75]     *See id.* ¶ 9.

payout,[76] the words of the written instrument say otherwise.  Section 10.2 clearly states that Plaintiffs are entitled to equity distributions when the combined Net Cash Flow from Operations and Gross Capital Proceeds exceed the Company's aggregate Acquisition and Development Expenses.[77]  There is no qualification that the enterprise must be income-generating beforehand, and Defendants point to no other provision in the contract that would support such an interpretation.  If the contract language "is clear and unambiguous on its face,"[78] the court must "give effect to the plain-meaning of the contract's terms and provisions."[79]  "[T]he court's analysis is initially focused 'solely on the language of the contract itself.  If that language is unambiguous, its plain meaning alone dictates the outcome.'"[80]  "[P]arol evidence such as industry usage [cannot] be used to create an ambiguity"

---

[76]      *Id.* ¶ 11.

[77]      *See* Agreement at 14 ("The Company shall distribute in cash to [Plaintiffs] . . . the Applicable Percentage [] of the amount, if any, by which the aggregate Net Cash Flow from Operations and Gross Capital Proceeds received by the Company . . . exceeds the aggregate Acquisition and Development Expenses incurred by the Company.").

[78]      *Pellaton*, 592 A.2d at 478.

[79]      *Osborn*, 991 A.2d at 1159-60.

[80]      *Comet*, 980 A.2d 1030 (quoting *Chambers v. Genesee & Wyo. Inc.*, No. 354, 2005 WL 2000765, at *5 (Del. Ch. Aug. 11, 2005)).

where one does not otherwise exist.[81]  The meaning of section 10.2 is clear.

Whether Defendants understood the contract as saying something different is

irrelevant[82] – the ordinary meaning of the words of the written instrument leaves

no room for uncertainty.[83]  Regardless of industry practice, a reasonable person in

the position of the parties would have understood section 10.2 as entitling

Plaintiffs to equity distributions as soon as the Company had taken in more capital

than it had expended in connection with the Project – and that is the meaning that

must control.[84]

---

[81]    *Sassano*, 948 A.2d at 468 n.86 (citing *Halliburton Co. v. Highlands Ins. Group, Inc.*, 811 A.2d 277, 280 (Del. 2002); *Knight v. Caremark Rx, Inc.*, No. 1750-N, 2007 WL 143099, at *1 (Del. Ch. Jan. 12, 2007)).

[82]    *See Rhone-Poulenc*, 616 A.2d at 1196 ("A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." (citing *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. Super. 1982))).

[83]    *See id.* ("Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty." (citation omitted)).

[84]    *See id.* ("The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." (citing *Steigler v. Insurance Co. of N. Am.*, 384 A.2d 398, 401 (Del. Super. 1978))).

## 2.   The Loans

Although Defendants' arguments regarding conditions precedent are unavailing, Plaintiffs still must prove that excess capital had indeed accrued under the formula set forth in section 10.2.  Plaintiffs argue that the aggregate Net Cash Flow from Operations and Gross Capital Proceeds exceeded the Company's Acquisition and Development Expenses in April 2007 and August 2008 – when the Company secured the $125 million and $50.35 million Inland Loans, respectively.  The success of their motion, therefore, turns on whether the Loans generate Gross Capital Proceeds as defined by the Agreement, meaning they constitute a Capital Transaction.[85]

The Agreement clearly defines Capital Transaction as a "financing or refinancing, of all or any portion of the Real Property or Project."[86]  While the terms "financing" and "refinancing" are not in themselves ambiguous – and a loan, as a general matter, would fall within the ordinary meaning of those terms – the question remains whether the provision, taken as a whole, is clear with respect to

---

[85]      *See* Agreement at 3 (defining "Gross Capital Proceeds").

[86]      *Id.* at 2.

22

these particular loans.[87]  In other words, the Court must determine whether the

Inland Loans – loans collateralized by assets and guarantees in addition to the

Property itself – can be considered a "financing or refinancing . . . *of the Real

Property or the Project.*"[88]  If the term Capital Transaction unambiguously applies

to the Loans, that is the end of the inquiry – Plaintiffs would be entitled to

summary judgment.  If "there is uncertainty in the meaning and application of

contract language," however, "the reviewing court must consider the evidence

offered in order to arrive at a proper interpretation of contractual terms."[89]

Defendants assert that the Inland Loans cannot be treated as

"financing or refinancing . . . *of the Real Property*" because they were cross-

collateralized by assets and guarantees in addition to the Property itself, including

Thomas's personal assets.[90]  The fact that Inland did not restrict how the loan

---

[87]    *See Kuhn*, 990 A.2d at 396-97 (noting that even if "isolated terms" support one interpretation, the court must read the contract as a whole to discern the intent of the parties).

[88]    Agreement at 2 (emphasis added).

[89]    *Eagle Indus.*, 702 A.2d at 1232 (citing *Pellaton*, 592 A.2d at 478).

[90]    Berg Aff. ¶ 8 (arguing that a loan "is ordinarily considered to be a financing or refinancing of a parcel of real property only if and to the extent the repayment of such borrowing is secured by that parcel and not by other assets or guarantees."). Plaintiffs contend that Defendants' argument is unsubstantiated, and that the act of encumbering the Property alone rendered the loans a Capital Transaction within the meaning of the Agreement. *See* Reply Affidavit of Joel

23

proceeds were to be spent, Defendants argue, further supports their contention that neither loan can be considered a "financing or refinancing" of the Project.[91] Accordingly, the Loans could not have generated Gross Capital Proceeds for the Company under the formula set forth in section 10.2.

The Loans were indeed secured by a combination of assets and guarantees.  However, Thomas's personal assets – the four shopping centers and his Sarasota Ranch – were not part of the security package for the initial $125 million loan; they were only offered as supplemental collateral for the second $50.35 million loan.[92]  The $125 million loan – which Plaintiffs contend triggered the payout provision of section 10.2 – was secured only by the Property itself and the guarantees provided by Thomas and the Company.

In that connection, Defendants argue that given the value of the Property, it could never serve as the sole collateral for a $125 million loan.

---

Ross in Further Support of Motion for Summary Judgment ("Ross Reply Aff.") ¶ 4.

[91]      See Thomas Aff. ¶ 14; Agreement at 2 (defining "Capital Transaction").

[92]      See Benvenuto Mem. at 2-3; 7/2/10 Hearing Transcript ("Hr'g Tr.") at 6:7-13.

24

Although the Property was appraised at $451 million,[93] Defendants contend that the Property was really worth only nineteen million dollars at the time the loan was made.[94]  Accordingly, Thomas's personal guarantee must have been the primary collateral for the loan, because no reasonable lender would grant $125 million in financing on land worth nineteen million dollars.[95]  To Defendants, this indicates that the loan was attributable to Thomas as an individual, and not to the Property.[96]

---

[93]     *See* "Appraisal Report: 205 Acres, The Railyards Project, Sacramento, California," prepared by Arthur Gimmy International ("Gimmy Appraisal"), attached to 7/5/10 letter to the Court from Gallion.

[94]     Defendants challenge the methodology used by the appraisers in assessing the value of the Property.  They argue the $451 million figure was based on the "highest and best use" value of the land – contingent on significant improvements to the Property over the course of many years – and not its "fair market value" at the time the loan was made.  *See* Berg Aff. ¶ 10; Hr'g Tr. at 17:13-15.  Plaintiffs respond that the $451 appraisal accurately reflected the value of the Property – admittedly an "undeveloped hole in the ground" with significant environmental issues – because it represented "over 230 acres of the largest infilled [sic] space in America," upon which the Company had received permission to build 2,000 residential units.  Once built, they argue, the Property would be worth billions.  *See* Hr'g Tr. at 22:6-15.

[95]     Defendants arrive at nineteen million dollars as the value of the Property after the sale of Parcel A by taking the purchase price of the entire 238-acre Property (seventy-four million dollars) and subtracting the amount paid by the City to acquire the eight-acre Parcel A (fifty-five million dollars).  *See* Hr'g Tr. at 5:7-16.

[96]     *See id.* at 5:21-24.

25

Defendants are trying to create an issue of material fact where one does not exist. According to Black's Law Dictionary, a "refinancing" is "[a]n exchange of an old debt for a new debt, as by negotiating a different interest rate or term or by repaying the existing loan with money acquired from a new loan."[97] The $125 million loan, therefore, clearly constitutes a refinancing of the Property, because the Company used a portion of the loan proceeds to pay off an existing debt owed to Union Pacific for the original purchase of the Property.[98] The $50.35 million loan would also fall within this definition of refinancing, because it was secured by a second mortgage against the Property. Furthermore, Inland increased the interest rate on the original loan from 7.9 percent to nine percent as additional security for repayment of the Loans.[99] Pursuant to a Loan Modification Agreement, the Company also renegotiated and extended the term of the original loan.[100]

Regardless of Defendants' contentions, the Company mortgaged the Property for the purposes of obtaining financing – Thomas's personal guarantee of

---

[97]   Black's Law Dictionary (8th ed. 2004).

[98]   *See* 4/26/07 Loan Funding Statement.

[99]   *See* Benvenuto Mem. at 1.

[100]   *See id.*

26

repayment does not change that.  Because the Property – and by extension

Plaintiffs' equity interest in that Property – was offered as collateral, the $125

million loan must be considered a financing or refinancing of the Property.  There

is no basis for Defendants' contention that a loan can only be considered a

financing or refinancing of a parcel of land if it secured by that property, and that

property alone.

While Thomas's considerable net worth – roughly three billion

dollars at the time – certainly constituted valuable security for repayment, it does

not necessarily follow that his personal guarantee was the primary basis for the

loan.  Because the appraised value of the Property was $451 million,[101] it is

reasonable to assume this land could serve as sufficient collateral for a $125

million loan.  In fact, the Inland representative who negotiated the loan expressly

stated that he believed himself to be making a "very good, safe loan at the time"[102]

precisely because the Property was worth "close to $500 million,"[103] meaning "it

---

[101]    *See* Gimmy Appraisal.

[102]    Cosenza Dep. at 18:13-14.

[103]    *Id.* at 19:1-4 ("[I]t's on 238-ish acres of land . . . . [a]nd that land, I
believe, seemed to have a value of . . . close to $500 million.  And so a loan of
around . . . $125 million seemed to be a pretty safe bet at the time.")

27

was about a . . . 30 percent loan to value [ratio]."[104]  Although Inland did demand a

personal guarantee from Thomas to secure the loan, there is little evidence to

suggest it did so because the Property was not sufficiently valuable collateral, as

Defendants contend.[105]  In fact, Inland had routinely required Thomas to

personally guarantee repayment as a condition for securing financing in the past.[106]

This speaks more to the loan officer's standard practice – his desire to "see the

person who is doing the deal stand behind the deal" – than to the particulars of the

Property or the Project.[107]

As for Defendants' claims regarding the value of the Property, it is

hard to believe that after selling just eight acres – less than four percent of the

entire land area – the remaining 230 acres were worth only nineteen million

---

[104]    *Id.* at 33:13-17 ("I felt comfortable with that [$125 million] number, because, in my mind, if the appraisal was 450 or 470 million, it was about a . . . 30 percent loan to value.").

[105]    *See id.* at 19:10-13.

[106]    *See id.* at 37:13-17 ("Stan [Thomas] would always . . . try to object to [the personal guarantee], but in almost every case I got him guaranteeing things on deals throughout the years because that's how I started out with him and that's how I continued to do business with him.").

[107]    *Id.* at 19:16-17.  *But see id.* at 27:11-21 ("I had several things in play. I had an appraisal of the property, which I believe was like 470-some million . . . I had his company . . . on the hook, the entity that actually owned the asset at the time, and then I had him personally, and those three things were extremely substantial to us for considering a loan like this against an asset like that.").

dollars.  Even if this were true, however, it would not change the analysis.  Inland

relied on the $451 million figure in deciding whether to grant the loan – the

accuracy of the appraisal is irrelevant.  Defendants' own expert admitted that if the

Property were in fact worth $451 million, as opposed to nineteen million, the

Loans might be considered a "financing or refinancing" of the Property because

Thomas's personal guarantee would not have []

"I-wouldn't-make-this-loan-without-it kind of significance [to the lender] . . . ."[108]

Regardless of its actual value, Inland believed the Property to be worth $451

million.  Based on that figure, Inland concluded the Property could serve as

collateral for a $125 million loan – that is all that matters.

Moreover, although Inland did not place restrictions on how the loan

proceeds would be spent, they clearly considered themselves to be "funding a loan

on [the] Sacramento property,"[109] rather than financing Thomas's real estate

projects more generally.  The Company is listed as the only borrower on the Loan

Documents, and the Company – not Thomas – was responsible for the interest on

---

[108]     Hr'g Tr. at 41:24-25.

[109]     Cosenza Dep. at 18:8-9 (referring to the $125 million quote Inland
offered to Thomas).

29

the Loans.[110]  Even the Loan Guaranty Agreement explicitly states that Inland was granting the $125 million loan "for the purpose of providing funding for . . . []the Property[]."[111]

Taken together, the evidence establishes that the $125 million loan was indeed a financing or refinancing of the Property.  The Agreement does not restrict Capital Transactions to loans secured by the Property alone.  In fact, the language of the contract implies that any financing or refinancing of the Property will trigger the payout provision.[112]  Moreover, section 10.2 seems to be directed at exactly the sort of situation that arose in this case.  On its face, section 10.2 precludes the Company from procuring financing against the Property in excess of what is needed for the Project.  Contrary to Defendants' contentions, this serves to protect Plaintiffs' equity interest in the Company – otherwise Thomas would be free to mortgage the Property for purposes unrelated to the Project, thereby putting Plaintiffs' investment at risk.  By saddling the Property with debt in order to

---

[110]   *See* Hr'g Tr. at 39:6-16.

[111]   Loan Guaranty Agreement at 1, Ex. A to 7/7/10 Letter to the Court from Padian.

[112]   *See* Agreement at 2 (defining "Capital Transaction" as a "financing or refinancing, of *all or any portion* of the Real Property or the Project" (emphasis added)).

obtain financing, and then using the funds so obtained on other projects, it appears as if Thomas and the Company did exactly what section 10.2 was designed to prevent. Accordingly, Plaintiffs are entitled to summary judgment on their First and Second Causes of Action.

### B.   Additional Factual Objections

Defendants object to Plaintiffs' calculations regarding the income generated from the 2006 sale of Parcel A to the City and simultaneous sale of the City's promissory note to Bank of America.[113] Defendants also challenge the accuracy of Plaintiffs' accounting methods, arguing that Plaintiffs erroneously base their calculation of Net Cash Flow from Operations on the Company's accrued revenues as reflected in its corporate tax returns, when the Agreement explicitly defines Net Cash Flow in terms of the Company's "cash receipts from operations."[114]

_____

[113]   Defendants contend that the sale of the promissory note itself was not a "financing or refinancing" of the Property, and therefore cannot be considered a Capital Transaction as defined by section 10.2. They also argue that the income generated by the sale of Parcel A would be offset by the cost of acquiring Parcel A, meaning no net income would be generated by the transaction. *See* Berg Aff. ¶ 7 n.1.

[114]   *See id.*; Agreement at 3 (defining "Net Cash Flow from Operations" as "cash receipts from operations of the Company, less the amount of the Company's operating expenses."). Plaintiffs argue that excess capital accrues even when using a cash-based calculation of Net Cash Flow from Operations. *See*

31

Defendants' objections go to the amount of the excess, but are not material to whether an excess existed in the first instance.  Regardless of the minor differences in accounting methods, so long as the Inland Loans count toward the Company's Gross Capital Proceeds as a matter of law, excess capital would have been generated under the formula set forth in section 10.2.  Accordingly, Defendants' contention that issues of fact remain unresolved do not warrant denial of the motion altogether.  Summary judgment is granted to Plaintiffs with respect to liability only.  The amount of that liability must be determined by the jury.

## V.    CONCLUSION

For the foregoing reasons the Plaintiffs' motion for partial summary judgment with respect to their First and Second Causes of Action is granted.  The Clerk of the Court is directed to close this motion (Docket No. 52).

---

Hr'g Tr. at 32:10-12.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            July 15, 2010

## - Appearances -

**For Plaintiffs:**

Gerald Padian, Esq.
Bradley M. Rank, Esq.
Howard M. Raber, Esq.
Tashjian & Padian
15 West 36th Street, 15th Floor
New York, NY 10018
(212) 319-9800

**For Defendants:**

Edward R. Gallion, Esq.
Steven Spielvogel, Esq.
Gallion & Spielvogel LLP
75 Rockefeller Plaza, 18th Floor
New York, NY 10019
(212) 710-5160