**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------- X

JOEL ROSS, ERIC LEVINE, and
JERDE DEVELOPMENT COMPANY,

        Plaintiffs,

        - against -

STANLEY E. THOMAS and S.
THOMAS ENTERPRISES OF
SACRAMENTO, LLC,

        Defendants.

------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/7/10

<u>OPINION AND ORDER</u>

**09 Civ. 5631 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

# I.   INTRODUCTION

Joel Ross, Eric Levine, and Jerde Development Company (f/k/a JPI Development Company) filed this action alleging, *inter alia*, that defendants breached the terms of their July 13, 2004 Operating Agreement (the "Agreement") with plaintiffs.[1]  On July 15, 2010, I granted summary judgment on plaintiffs' First and Second Causes of Action, but reserved judgment on the issue of damages.

---

[1]     Plaintiffs' First Cause of Action is a breach of contract claim against S. Thomas Enterprises of Sacramento LLC.  *See* Amended Complaint ¶¶ 110-114. Their Second Cause of Action is against Stanley E. Thomas for breaching his personal guaranty of that contract.  *See id.* ¶¶ 115-117.

1

Plaintiffs now move for summary judgment as to damages pursuant to Federal Rule of Civil Procedure 56(b) and to dismiss defendants' counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(6).  If the motion to dismiss is not granted, plaintiffs move in the alternative for this Court to direct entry of final judgment on plaintiffs' First and Second Causes of Action pursuant to Federal Rule of Civil Procedure 54(b).

## II.   BACKGROUND

A more thorough recitation of the facts is contained in the July 15, 2010 Opinion.[2]  Familiarity with that decision is assumed.

### A.   The Agreement

In June 2002, plaintiffs reached an agreement with Stanley E. Thomas to collaborate in the acquisition and development of approximately 238 acres of land (the "Property") owned by Union Pacific Rail Yards in Sacramento, California (the "Project").[3]  On April 29, 2004, plaintiffs and Thomas transferred all their rights and contracts in the Project to a limited liability company, S. Thomas Enterprises of Sacramento, LLC (the "Company").[4]

---

[2]      *See generally Ross v. Thomas*, No. 09 Civ. 5631, — F. Supp. 2d —, 2010 WL 2816873 (S.D.N.Y. July 15, 2010).

[3]      *See id.* at *1.

[4]      *See id.*

2

On July 13, 2004, plaintiffs and defendants entered into the Agreement, through which Thomas purchased plaintiffs' interest in the Company in exchange for one hundred equity shares (referred to by the Agreement as "Special Units").[5] Pursuant to section 10.2 of the Agreement, plaintiffs were entitled to cash distributions in exchange for their shares of equity ownership if certain conditions precedent were met:

> The Company shall distribute in cash to [Plaintiffs] . . . the Applicable Percentage (defined below) of the amount, if any, by which the aggregate Net Cash Flow from Operations[6] and Gross Capital Proceeds[7] received by the Company, any Equity Owner, or any of their respective Affiliates through the date of determination exceeds the aggregate Acquisition and

---

[5]     *See id.* at *1-*2. *See also* Operating Agreement of Millennia Sacramento, III, LLC ("Agreement"), Ex. I to Affidavit of Gerald Padian ("Padian Aff."), Counsel for Plaintiffs. The Company changed its name to Thomas Enterprises of Sacramento, LLC, and then changed to its present name, S. Thomas Enterprises of Sacramento, LLC. The Agreement stated that it "shall be governed by and construed in accordance with the laws of the State [of Delaware] . . . and specifically the [Delaware Limited Liability Company] Act." *Id.* § 16.3.

[6]     The Agreement defines "Net Cash Flow from Operations" as "[t]he Company's cash receipts from operations of the Company, less the amount of the Company's operating expenses." *Id.* § 1.

[7]     The Agreement defines "Gross Capital Proceeds" as "[t]he gross proceeds of a Capital Transaction, less the expenses incurred by the Company, an Equity Owner, and any of their respective Affiliates in connection with the negotiation, preparation, and execution of the transactional documents and in connection with the consummation of the transaction . . . ." *Id.* The term "Capital Transaction" is defined as "[a] sale or other transfer, or a financing or refinancing, of all or any portion of the Real Property or the Project . . . ." *Id.*

3

Development Expenses[8] incurred by the Company, any Equity Owner, or any of their respective Affiliates through the Date of Determination.[9]   The portion of such excess amount shall be payable to [plaintiffs] as and when such excess amount is received, being the Date of Determination.

The Agreement defines "Applicable Percentage" as "0.225 [percent] per Special Unit outstanding at the time in question."[10]  Pursuant to these terms, as the Agreement explains, the initial Applicable Percentage would be 22.5 percent (0.225 percent of 100 Special Units).[11]  The Agreement, however, caps the maximum aggregate purchase price for plaintiffs' Special Units at ten million dollars.[12]

---

[8]      The Agreement defines "Acquisition and Development Expenses" as "[t]he direct costs of acquiring and developing the Real Property and the Project, including the following expenses: (i) the purchase price for the Real Property and other direct expenses incurred in connection with the acquisition of the Real Property, including attorneys' fees, travel expenses, and other expenses incurred in connection with the negotiation, preparation, and execution of the transactional documents and in connection with the consummation of the acquisitions . . . and (ii) direct expenses incurred in connection with the development of the Real Property and the Project . . . ." *Id.*

[9]      The Agreement defines "Date of Determination" as "[t]he closing date of any material financing, refinancing, equity investment in the Company, material transfer of any assets of the Company or a sale of land or any other material assets." *Id.*

[10]      *Id.* § 10.2.

[11]      *See id.* § 17.3.2.

[12]      *See id.*

4

### B.     Loans

According to section 10.2 of the Agreement, therefore, plaintiffs are owed cash distributions when the Company takes in more capital than it has expended in connection with the Project.  In moving for summary judgment, plaintiffs asserted that these conditions for payment were met on April 26, 2007 when the Company secured a $125 million loan from Inland America Real Estate Trust, Inc. ("Inland") and again on August 29, 2008 when the Company secured another $50.35 million loan from Inland.[13]

In granting summary judgment, I made several holdings relevant to this decision.  *First*, I determined that "a reasonable person in the position of the parties would have understood section 10.2 as entitling [p]laintiffs to equity distributions as soon as the Company had taken in more capital than it had expended in connection with the Project" regardless of whether the Project had yet been developed into a viable, income-generating entity.[14]  *Second*, I held that the loans constituted Capital Transactions, implicating section 10.2 and entitling plaintiffs to cash payments as of the date of the first loan.[15]  *Third*, because

---

[13]     *See Ross*, 2010 WL 2816873, at *4-*5.

[14]     *Id.* at *5.

[15]     *See id.* at *6-*8.

5

defendants raised issues of fact relating to the amount (but not the existence) of excess capital generated by the Company, I reserved the issue of damages for the jury.[16]

### C.    Sale of Property

The Company engaged in further transactions relevant to plaintiffs' motion for summary judgment on damages.  In late 2006, the Company sold a portion of the Property ("Parcel A") to the City of Sacramento for fifty-five million dollars – thirty million dollars in cash and a promissory note worth twenty-five million dollars.[17]  The Company sold the City's promissory note to Bank of America for twenty-five million dollars.[18]

### D.    Defendants' Counterclaims

Defendants have also asserted counterclaims against plaintiffs.[19] Defendants assert that Levine entered into an agreement with them, pursuant to which he received sixty-five thousand dollars a month to act as the project

---

[16]     *See id.* at *8.

[17]     *See id.* at *2.

[18]     *See id.*

[19]     Defendants originally asserted these counterclaims against plaintiffs in their answer on January 6, 2010.  *See* Defendants' Answer.  However, they amended those counterclaims on August 25, 2010.  *See* Defendants' Amended Counterclaims ("Am. Countercl.")

manager.[20]  In that capacity, Levine was required to use "any and all funds provided by defendants exclusively for the payment of operating and consulting expenses directly related to the initial phases of the development of the Project and . . . and not for personal – *i.e.*, non-project related – purposes."[21]  Pursuant to the agreement, from March 2003 until June 2005, defendants regularly transferred funds into Levine's general personal and unsegregated bank account so that Levine could make payments for services rendered by outside consultants and third-parties working on the project.[22]  In total, defendants transferred $3,586,282 into Levine's personal bank account for these purposes.[23]

However, according to defendants, Levine did not use the entirety of these funds for their intended purposes.  Instead, he used a significant portion to finance other projects and pay for his personal expenses.[24]  In total, "only $2,873,187 of the [$3,58,282 transferred to Levine by defendants] were disbursed by Levine to third-parties in connection with the . . . Project."[25]  On the basis of

---

[20]     *See* Am. Countercl. ¶¶ 1, 5.

[21]     *Id.* ¶ 1.

[22]     *See id.* ¶ 7

[23]     *See id.* ¶ 10

[24]     *See id.* ¶¶ 3, 8-9.

[25]     *Id.* ¶ 11.

7

these allegations, defendants assert counterclaims against Levine for breach of contract,[26] unjust enrichment,[27] conversion[28] and breach of fiduciary duty.[29]

Defendants also assert that some of these funds were used for the "personal purposes of the other plaintiffs in this action,"[30] but do not specify how these funds were used or the portion of these funds that were used in this manner. On the basis of this sole factual allegation, defendants assert counterclaims against the other plaintiffs for breach of contract[31] and unjust enrichment.[32]

## III.    APPLICABLE LAW

### A.    Legal Standards

#### 1.    Summary Judgment

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of

---

[26]    *See id.* ¶ 12.

[27]    *See id.* ¶¶ 14-17.

[28]    *See id.* ¶¶ 18-22.

[29]    *See id.* ¶¶ 23-26.

[30]    *Id.* ¶ 3.

[31]    *See id.* ¶ 13.

[32]    *See id.* ¶ 15.

law."[33]  "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit under the governing law.'"[34]  "[T]he burden of demonstrating that no material fact exists lies with the moving party . . . ."[35]  In determining whether a genuine issue of material fact exists, the court must "constru[e] the evidence in the light most favorable to the non-moving party and draw all reasonable inferences" in that party's favor.[36]

## 2.   Motion to Dismiss

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept as true all of the factual allegations contained in the complaint"[37] and "draw all reasonable inferences in the plaintiff's favor."[38] However, the court need not accord "[l]egal conclusions, deductions or opinions

---

[33]   Fed. R. Civ. P. 56(c).

[34]   *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 34 (2d Cir. 2008)).

[35]   *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008).

[36]   *Sledge v. Kooi*, 564 F.3d 105, 108 (2d Cir. 2009).

[37]   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).  *Accord Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009).

[38]   *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).

9

couched as factual allegations . . . a presumption of truthfulness."[39]  To survive a Rule 12(b)(6) motion to dismiss, the allegations in the complaint must meet a standard of "plausibility."[40]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[41]  Plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[42]  Pleading a fact that is "merely consistent with a defendant's liability" does not satisfy the plausibility standard.[43]

When determining the sufficiency of a claim under Rule 12(b)(6), the court is normally required to consider only the allegations in the complaint. However, the court is allowed to consider documents outside the pleading if the documents are integral to the pleading or subject to judicial notice.[44]

---

[39]    *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (quotation marks omitted).

[40]    *Twombly*, 550 U.S. at 564.

[41]    *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quotation marks omitted).

[42]    *Id.* (quotation marks omitted).

[43]    *Id.* (quotation marks omitted).

[44]    *See Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156 (2d Cir. 2006).

### 3.    Entry of Partial Final Judgment

Federal Rule of Civil Procedure 54(b) "provides an exception to the general principle that a final judgment is proper only after the rights and liabilities of all the parties to the action have been adjudicated."[45]  It allows a district court to enter judgment as to fewer than all the claims in an action under certain conditions.[46]

*First*, "multiple claims or multiple parties must be present."[47]  In instances of multiple claims, a district court should only enter final judgment if the claims are separable.[48]  "Claims are normally treated as separable . . . if they

---

[45]    *Hogan v. Consolidated Rail Corp.*, 961 F.2d 1021, 1024-25 (2d Cir. 1992).

[46]    Rule 54(b) provides:

> When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for entry of judgment.

[47]    *Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1091 (2d Cir. 1992).

[48]    *See Cullen v. Margiotta*, 811 F.2d 698, 711 (2d Cir. 1987) (quotation marks and citations omitted), *overruled on other grounds, Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987).

involve at least some different questions of fact and law and could be separately

enforced, or if different sorts of relief are sought."[49]  "When these features are

present, claims may be considered separable even if they have arisen out of the

same transaction or occurrence."[50]

      *Second*, "at least one claim, or the rights and liabilities of at least one

party, must be finally decided within the meaning of 28 U.S.C. § 1291."[51]  Entry of

final judgment gives the Circuit Court jurisdiction to hear a direct appeal of the

judgment pursuant to section 1291.[52]  Accordingly, unlike the certification of an

interlocutory appeal,[53] direction of final judgment on a claim, if properly granted,

automatically permits an appeal.[54]  "A decision is final for purposes of section

1291 when it 'ends the litigation [of the claim] on the merits and leaves nothing for

---

[49]    *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 21 (2d Cir. 1997).

[50]    *Cullen*, 811 F.2d at 711.

[51]    *Id.*

[52]    *See* 28 U.S.C. § 1291 ("The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all *final decisions* of the district courts of the United States . . . ." (emphasis added)).

[53]    *See* 28 U.S.C. § 1292(b).

[54]    *See Ginett*, 962 F.2d at 1091.

the court to do but execute the judgment.'"[55]

     *Third*, "the district court must make an express determination that there is no just reason for delay and expressly direct the clerk to enter judgment."[56] The term "no just reason for a delay" is somewhat of a misnomer – as courts do not simply evaluate whether there is a just reason for delay, but generally apply a balancing test that weighs multiple factors to determine whether directing entry of a partial final judgment is in '"the interest of sound judicial administration.'"[57] Importantly, a district court should consider the efficiency interests of both the district and appellate courts,[58] as well as the balance of equities as to the parties.[59]

---

[55]      *Ellis v. Israel*, 12 F.3d 21, 23 (2d Cir. 1993) (citations omitted). *Accord Transport Workers Union of America, Local 100, AFL-CIO v. N.Y. City Transit Authority*, 505 F.3d 226, 230 (2d Cir. 2007).

[56]      *Ginett*, 962 F.2d at 1092 (quotation marks omitted).

[57]      *Id.* at 1095 (quoting *Curtiss-Wright Corp. v. General Elec. Co.*, 446 U.S. 1, 8 (1980)). *Accord Arlinghaus v. Ritenour*, 543 F.2d 461, 463 (2d Cir. 1976) ("[T]he determination involves 'weighing the overall policy against piecemeal appeals against whatever exigencies the case at hand may present . . . .'" (quoting *Panichella v. Penn. R.R. Co.*, 252 F.2d 452, 455 (3d Cir. 1958)).

[58]      *See Ginett*, 962 F.2d at 1095.

[59]      *See Curtiss-Wright*, 446 U.S. at 8 ("[A] district court must take into account judicial administrative interests as well as the equities involved."); *State of N.Y. v. AMRO Realty Corp.*, 936 F.2d 1420, 1426 (2d Cir. 1991) ("Accordingly, we defer to the district court's judgment, in its role as dispatcher, that the interests of 'sound judicial administration' as well as fairness to the parties, mitigate in favor of certification.").

**B.     Substantive Law**

    **1.     Contract Interpretation Under Delaware Law**[60]

       "[T]he proper interpretation of language in a contract is a question of

law."[61]  "Summary judgment is an appropriate process for the enforcement of

unambiguous contracts because there is no material dispute of fact for the court to

resolve."[62]  "Delaware adheres to the objective theory of contract interpretation"

under which "the court looks to the most objective indicia of [the parties'] intent:

the words found in the written instrument."[63]  "When the plain, common, and

---

    [60]    A federal court sitting in diversity applies the choice of law rules of
the state in which it sits. *See Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 147
(2d Cir. 2008) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496-97
(1941)).  Under New York Law, "[a]bsent fraud or a violation of public policy, a
court is to apply the law selected in the contract as long as the state selected has
sufficient contacts with the transaction." *Fieger v. Pitney Bowes Credit Corp.*, 251
F.3d 386, 393 (2d Cir. 2001).  Neither party disputes the applicability of the
Agreement's choice of law provision, which designates Delaware law as
controlling.  Accordingly, plaintiffs' contract claims are governed by Delaware
law. *See* Agreement at 19.

    [61]    *Allied Capital Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030
(Del. Ch. 2006).

    [62]    *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1030
(Del. Ch. 2008) (citation omitted).

    [63]    *Sassano v. CIBC World Mkts. Corp.*, 948 A.2d 453, 461 (Del. Ch.
2008). *Accord Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228,
1232 (Del. 1997) ("If a contract is unambiguous, extrinsic evidence may not be
used to interpret the intent of the parties, to vary the terms of the contract or to
create an ambiguity.").

ordinary meaning of the words lends itself to only one reasonable interpretation, that interpretation controls the litigation."[64] If the language in the contract "is clear and unambiguous on its face" courts may not "consider parol evidence to interpret it or search for the parties' intentions."[65]

Contract terms are not rendered ambiguous simply because the parties disagree as to their construction.[66] "A trial judge must review a contract for ambiguity through the lens of 'what a reasonable person in the position of the parties would have thought the contract meant.'"[67] Contract terms are only ambiguous "[w]hen the provisions in controversy are fairly susceptible [to] different interpretations or may have two or more different meanings."[68]

---

[64]   *Sassano*, 948 A.2d at 461 (citing *Eagle*, 702 A.2d at 1232). *Accord AT&T Corp. v. Lillis*, 953 A.2d 241, 252 (Del. Super. 2008) ("'Delaware courts will not destroy or twist [contract] language under the guise of construing it. When the language of a . . . contract is clear and unequivocal, a party will be bound by its plain meaning because creating an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented . . . .'" (quoting *Lorillard Tobacco Co. v. American Legacy Found.*, 903 A.2d 728, 739 (Del. 2006); *Rhone-Poulenc Basic Chem. Co. v. American Motorist Ins. Co.*, 616 A.2d 1192, 1195-96 (Del. 1992))).

[65]   *Pellaton v. Bank of N.Y.*, 592 A.2d 473, 478 (Del. 1991).

[66]   *See Rhone-Poulenc*, 616 A.2d at 1196.

[67]   *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396 (Del. Super. 2010) (quoting *Rhone-Poulenc*, 616 A.2d at 1197).

[68]   *Eagle Indus.*, 702 A.2d at 1232.

15

When faced with an ambiguous contract provision, "the interpreting court must look beyond the language of the contract to ascertain the parties' intentions" at the time of drafting.[69]  In making such a determination, "the court [] may consider objective [parol] evidence, 'including the overt statements and acts of the parties, the business context, the parties' prior dealings, and industry custom.'"[70]  "[W]here a contract provision lends itself to two interpretations, a court will not adopt [an] interpretation that leads to unreasonable results, but instead will adopt the construction that is reasonable and that harmonizes the affected contract provisions."[71]  "An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract."[72]

---

[69]     *Id.*

[70]     *Julian v. Julian*, No. 1892-VCP, 2010 WL 1068192, at *5 (Del. Ch. Mar. 22, 2010) (quoting *Concord Steel, Inc. v. Wilmington Steel Processing Co.*, No. 19035, 2009 WL 3161643, at *6 (Del. Ch. Sept. 30, 2009)).

[71]     *Axis Reinsurance Co. v. HLTH Corp.*, 993 A.2d 1057, 1063 (Del. Super. 2010) (citing Restatement (Second) of Contracts § 203 (1981); *Lorillard*, 903 A.2d 728; *O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 288 (Del. 2001); and *Holland v. National Auto. Fibres*, 194 A. 124, 127 (Del. Ch. 1937)).

[72]     *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. Super. 2010) (citations omitted).

2.      **New York Statute of Limitations**[73]

Defendants have asserted counterclaims for breach of contract, breach of fiduciary duty, unjust enrichment and conversion.  In New York, breach of contract claims are governed by a six-year statute of limitations.[74]  Conversion claims are governed by a three-year statute of limitations.[75]  While New York courts have occasionally applied a three-year statute of limitations to unjust enrichment claim,[76] they more commonly apply a six-year statute of limitations.[77] New York law does not provide a single statute of limitations for breach of fiduciary duty claims.  "Rather, the choice of the applicable limitations period

---

[73]      "Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York . . . statutes of limitations." *Stuart v. American Cyanamid Co.*, 158 F.3d 622, 627 (2d Cir. 1998) (citing *Guaranty Trust Co. v. York*, 326 U.S. 99, 108-09 (1945); *Klaxon*, 313 U.S. at 496).  Accordingly, I apply New York's statute of limitations to defendants' counterclaims.

[74]      *See* Civil Practice Law and Rules ("CPLR") § 213(2).

[75]      *See id.* § 214(3).

[76]      *See, e.g.*, *Ingrami v. Rovner*, 847 N.Y.S.2d 132, 134 (2d Dep't 2007).

[77]      *See Sirico v. F.G.G. Prods., Inc.*, 896 N.Y.S.2d 61, 66 (1st Dep't 2010); *37 Park Dr. S., Inc. v. Duffy*, 881 N.Y.S.2d 481, 482 (2d Dep't 2009); *Elliot v. Qwest Commc'ns Corp.*, 808 N.Y.S.2d 443, 445 (3d Dep't 2006).  *See also* CPLR § 213(1) (directing application of a six-year statute of limitations to "an action for which no limitation is specifically prescribed by law").

17

depends on the substantive remedy that the plaintiff seeks."[78] If the remedy sought

is purely monetary in nature, courts apply a three-year statute of limitations.[79] If

the remedy sought is equitable, courts apply a six-year statute of limitations.[80]

"Moreover, where an allegation of fraud is essential to a breach of fiduciary duty

claim, courts have applied a six-year statute of limitations."[81]

## IV.    DISCUSSION

### A.    Summary Judgment as to Damages

Plaintiffs are owed 22.5 percent of any "excess amounts" received by

the Company up to a maximum of ten million dollars, at which point their Special

Units are fully redeemed and plaintiffs no longer have any equity interest in the

Company.   I have already held that, as of the date of the first loan on April 26,

2007, the Company's Gross Capital Proceeds Plus Net Cash Flow from Operations

exceeded its Acquisition and Development Costs.   Accordingly, the only remaining

question relating to plaintiffs' summary judgment motion as to damages is whether

---

[78]    *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 139 (2009).

[79]    *See id.* (citing CPLR § 214(4) (directing application of a six-year statute of limitations to injuries to property)).

[80]    *See id.* (citing CPLR § 213(1)).

[81]    *Id.*

that excess equaled at least $44,444,444.44 ($44,444,444.44 x .225 =

$10,000,000).

### 1.   Gross Capital Proceeds Plus Net Cash Flow from Operations

As of April 26, 2007, the Company entered into two Capital

Transactions. *First*, it received the one hundred and twenty-five million dollar loan

on August 26, 2007.  Deducting $1,477,540 in expenses and $2,200,000 reserved

by Inland for environmental liabilities, the proceeds from the loan amount to

$121,322,460.[82]

*Second*, the Company sold Parcel A to the City of Sacramento.[83]

Subtracting closing costs, the Company's proceeds from the transaction were

$53,967,805.[84]  Defendants assert that it is premature to calculate these proceeds

---

[82]     *See* Affidavit of Elliot A. Lesser ("Lesser Aff."), a Certified Public Accountant Retained by Plaintiffs' Counsel, ¶ 8.

[83]     *See* Agreement § 1 (defining "Capital Transaction" to include "[a] sale or other transfer . . . of all or a portion of the Real Property or the Project . . .").  Defendants assert that "the sale of Parcel A to the City of Sacramento should not be included as part of the analysis" of the Company's Gross Capital Proceeds. Memorandum of Law in Opposition to Plaintiffs' (Third) Motion for Partial Summary Judgment, Pursuant to Rule 56 of the Federal Rules of Civil Procedure, and in Opposition to Plaintiffs' Motion to Dismiss, Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Def. Opp.") at 2.  However, the Agreement expressly states that the sale of "a portion of the Real Property" is a Capital Transaction.  Agreement § 1.  This express language is controlling.

[84]     *See* Lesser Aff. ¶ 8.

19

because "the actual purchase price of Parcel A has yet to be determined in arbitration."[85]  However, there is no legitimate dispute that (i) Parcel A was transferred to the City;[86] and (ii) as of April 26, 2007, the Company had received $53,967,805 in proceeds from that sale.[87]  Regardless of whether an arbitration is scheduled to occur in the future (and defendants have not provided any evidence of an agreement compelling arbitration), as of April 26, 2007, the Company had received these proceeds from a Capital Transaction as defined by the Agreement.

Adding these two Capital Transactions together, the Company's Gross Capital Proceeds totaled $175,290,265 as of April 26, 2007.  In addition, as indicated by its tax returns, the Company had a *negative* net Cash Flow from Operations of $8,285,398 at that time.[88]  Accordingly, the aggregate Net Cash Flow from Operations and Gross Capital Proceeds received by the Company on April 26, 2007 was $167,004,867.

---

[85]    Def. Opp. at 2 (citing Affidavit of Suheil Totah ("Totah Aff."), Vice President at the Company in Charge of Development of the Project, ¶¶ 7-8).

[86]    *See* Dec. 21, 2006 Grant Deed, Ex. A. to Affidavit of Bradley M. Rank, Counsel for Plaintiffs.

[87]    *See* The Company's Trial Balance and Ledger as of Dec. 31, 2006, Ex. F to Padian Aff., at ST8054.

[88]    *See* Excerpts of the Company's 2007 Federal Tax Return ("Company's 2007 Tax Return"), Ex. H to Padian Aff., at ST8574.

20

## 2.   Acquisition and Development Costs

According to evidence submitted by plaintiffs, the Company expended $119,744,283 in Acquisition and Development Expenses.[89]  Defendants argue that in addition to these costs, the Acquisition and Development Expenses should include "reasonable *future* reserves" for the development of the Project.[90]

This argument is similar to another argument defendants raised when plaintiffs moved for summary judgment on the issue of liability.  At that time, Defendants asserted that "distributions under Section 10.2 [were] premature because the Agreement never contemplated that Plaintiffs would be entitled to any kind of a payout until and unless the Project had been developed to a viable, income-generating entity."[91]  I rejected that argument – finding that the Agreement did not contain any qualification that "the enterprise must be income-generating" before section 10.2 is implicated and that the clear language of the Agreement indicates that plaintiffs were entitled "to equity distributions *as soon as* the

---

[89]   *See* Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for (i) Summary Judgment as to Damages on Their First and Second Causes of Action and (ii) to Dismiss the Defendants' Counterclaims ("Pl. Mem.") at 9 (citing Lesser Aff. ¶¶ 16-18; Company's 2007 Tax Return at ST8574, ST8582-83).

[90]   Def. Opp. at 3 (emphasis added).

[91]   *Ross*, 2010 WL 2816873, at *5 (citation and quotation marks omitted).

Company had taken in more capital than it had expended in connection with the Project."[92]

Similarly, there is no indication in the Agreement that speculative future costs should be included in the Acquisition and Development Expenses referenced by the Agreement. Section 10.2, by its express terms, only includes Acquisition and Development Expenses "incurred by the Company . . . through the Date of Determination" – in this instance, April 26, 2007. Defendants have not identified any future expenses recorded in the Company's financial statements – which could arguably be included in Acquisition and Development Expenses incurred as of the Date of Determination – that plaintiffs have not included in their calculation of the Company's Acquisition and Development Expenses. Instead, defendants have cited an external report commissioned by the City of Sacramento and completed in December of 2007 (several months after the Date of Determination) suggesting that the Company will have to expend additional resources to develop the Project.[93] This document does not create a genuine issue of material fact as to whether the Company had *already incurred* these expenses by April 26, 2007. Accordingly, these speculative future costs are not included in the

---

[92]    *Id.*

[93]    *See* Def. Opp. at 3 (citing Totah Aff. ¶ 8 and Table C to an External Report Commissioned by the City of Sacramento, Ex. B to Totah Aff.).

Acquisition and Development Expenses referenced by the Agreement.

### 3.    Conclusion

Subtracting the Company's Acquisition and Development Expenses ($119,744,283) from its aggregate Net Cash Flow From Operations and Gross Capital Proceeds ($167,004,867), the Company had an excess amount of $47,260,584. Because 22.5 percent of this amount is greater than ten million dollars, plaintiffs were therefore entitled to the maximum ten million dollar excess payment as of April 26, 2007.

### B.    Motion to Dismiss

Plaintiffs make three arguments in favor of dismissal of defendants' counterclaims. *First*, plaintiffs argue that defendants' non-contract counterclaims are barred by the applicable statute of limitations.[94] Because plaintiffs' alleged misconduct ended in June 2005 and defendants first filed their counterclaims on January 2010, defendants' breach of fiduciary duty and conversion counterclaims

---

[94]    *See* Pl. Mem. at 24-25. *See Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir. 1989) ("Where the dates in a complaint show that an action is barred by a statute of limitations, a defendant may raise the affirmative defense in a pre-answer motion to dismiss. Such a motion is properly treated as a Rule 12(b)(6) motion . . . ."); *Morris v. People's Rep. of China*, 478 F. Supp. 2d 561, 566 (S.D.N.Y. 2007) (when evaluating a statute of limitations defense in the context of a motion to dismiss, a "[c]ourt may not look outside the complaint and 'any documents that are either incorporated into the complaint by reference or attached to the complaint as exhibits.'" (quoting *Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004))).

are barred by the applicable three-year statute of limitations.[95] However, a six-year statute of limitations applies to defendants' unjust enrichment and breach of contract counterclaims.[96] Accordingly, these counterclaims are timely.

  *Second*, plaintiffs argue that defendants' have failed to plead factual

---

[95]  Defendants argue that a six-year statute of limitations should apply to their breach of fiduciary duty claims because "fraud has been alleged." Pl. Opp. at 7. However, defendants do not specifically allege a fraud claim. *See Ball Interior Demolition Corp. v. Palmadessa*, 874 F. Supp. 576, 588 (S.D.N.Y. 1995) ("There are five elements necessary to sustain a claim in fraud under New York law: (1) misrepresentation of a material fact; (2) the falsity of that misrepresentation; (3) scienter, or intent to defraud; (4) reasonable reliance on that representation; and (5) damage caused by such reliance." (collecting cases)). Recognizing that the complaint insufficiently alleges fraud, defendants have requested that they be granted leave to "incorporate the fraud allegations delineated in the affidavit of Stanley E. Thomas, dated September 10, 2010." Def. Opp. at 7. However, this affidavit contains little factual content not already alleged by defendants, and, even if this extra factual content were incorporated, defendants' allegations would not meet the pleading requirements for a claim of fraud under Federal Rule of Civil Procedure 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). In particular, neither the Counterclaims nor the affidavit sufficiently plead a misrepresentation by plaintiffs or reasonable reliance by defendants. Accordingly, I deny defendants' request to replead. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (holding that it is proper to deny a request to amend when repleading would be "futile").

[96]  Plaintiffs argue that a three-year bar applies to the unjust enrichment claims because defendants seek legal damages, as opposed to equitable relief. *See* Reply Memorandum of Law in Further Support of Plaintiffs' Motion for Summary Judgment as to Damages on Their First and Second Causes of Action and to Dismiss the Defendants' Counterclaims at 9. However, as discussed, this is the rule for breach of fiduciary duty claims, not unjust enrichment claims. *See supra* Part III.B.2. The vast majority of courts have applied a six-year statute of limitations to unjust enrichment claims regardless of whether plaintiffs are seeking legal or monetary relief. *See, e.g., 37 Park Dr. S.*, 881 N.Y.S.2d at 482.

content allowing this Court to draw the reasonable inference the plaintiffs are liable for the alleged misconduct.[97]  With respect to defendants' allegations against Levine, this is incorrect.  Defendants have alleged, *inter alia*, (1) that Levine entered into an agreement requiring him to disburse funds intended for third parties;[98] (2) that defendants transferred a specific amount to Levine to disburse to third parties;[99] (3) that Levine commingled these funds with his own funds in a personal bank account;[100] and (4) that a significant amount of the money transferred to Levine was not distributed to the intended third parties.[101]  These allegations provide sufficient factual content to make defendants' breach of contract[102] and unjust enrichment counter claims[103] plausible.

---

[97]     *See* Pl. Mem. at 21-23.

[98]     *See* Am. Countercl. ¶ 1

[99]     *See id.* ¶ 10.

[100]    *See id.* ¶ 8.

[101]    *See id.* ¶¶ 11-13.

[102]    *See Terwilliger v. Terwilliger*, 206 F.3d 240, 245-46 (2d Cir. 2000) ("To prevail on a breach of contract claim under New York law, a plaintiff must prove (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." (quotation marks and citations omitted)).

[103]    *See Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield*, 448 F.3d 573, 586 (2d Cir. 2006) ("Cases dealing with unjust enrichment in New York are uniform in their recognition of three elements of the claim: To prevail on a claim for unjust enrichment in New York, a plaintiff must establish (1) that the

However, defendants have not pled sufficient factual allegations against the other plaintiffs. Defendants do not allege that the other plaintiffs were parties to the agreement at issue,[104] and thus, they cannot be held liable for breach of contract. In addition, although defendants allege that the Project funds transferred to Levine were used for the "personal purposes of the other plaintiffs,"[105] the allegations pled by defendants do not give rise to a plausible inference that these plaintiffs were in fact unjustly enriched. Specifically, defendants do not make any attempt to allege what personal purposes the funds were used for, how much money was transferred for use by these plaintiffs, when the funds were used for this purpose, or any other specifics. Accordingly, I find that the single bare allegation that funds were also used to benefit the other plaintiffs is insufficient to render defendants' unjust enrichment counterclaims plausible.

*Third*, plaintiffs assert that defendants' counterclaims are barred by a release contained in section 17.8 of the Agreement.[106] But the Agreement was

---

defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution." (quotation marks and citation omitted)).

[104]  *See* Am. Counterclaim ¶ 1.

[105]  *Id.* ¶ 3.

[106]  *See* Pl. Mem. at 23-24 (citing Agreement § 17.8).

executed on July 13, 2004, while Levine's misconduct allegedly continued until June 2005. Accordingly, this release, which is backward not forward looking,[107] cannot possibly bar all of defendants' breach of contract and unjust enrichment claims against Levine.

Plaintiffs' motion to dismiss defendants unjust enrichment and breach of contract counterclaims against Levine is denied. However, defendants' remaining counterclaims against Levine, and all their counterclaims against the other plaintiffs, are dismissed with prejudice.

## C.   Entry of Partial Final Judgment

Because I find that there is no just reason for delay, I grant plaintiffs' motion for entry of final judgment on their First and Second Causes of Action. *First*, there is no doubt that a final decision has been rendered on these claims, as I have granted plaintiffs' motions for summary judgment as to liability and damages on their First and Second Causes of Action.

*Second*, the remaining claims are separable. Plaintiffs have indicated a willingness to voluntarily dismiss their remaining causes of action if judgement

---

[107]   *See* Agreement § 17.8 ("[E]ach of the parties hereto releases any claims, known or unknown, that it had, has or hereafter may have against any of the other parties hereto, for damages, demands, losses, liabilities and for any action, reason, matter or thing occurring, arising, accruing, or existing *before the date hereof*, relating to the Property or the Project or both . . . ." (emphasis added)).

27

is entered.[108]  While the remaining counterclaims relate to the same Project as

plaintiffs' claims, they arise from a different agreement and relate to distinct

monetary transactions.[109]  Moreover, because defendants' counterclaims have been

dismissed against all plaintiffs other than Levine, preventing the other plaintiffs

from seeking finalize their recovery on the First and Second Causes of Action

would unfairly prejudice them.

      *Third*, there is a real and immediate danger of prejudice if final

judgment on these claims is not entered.  Inland has commenced foreclosure

proceedings against the Company's sole asset – the Real Property purchased to

develop the Project.[110]  If a judgment can be registered prior to any foreclosure

sale, plaintiffs may be able to recover against the Company.  Otherwise, plaintiffs

will have to recover solely from Thomas – an individual who may lack the

monetary resources and/or liquidity necessary to satisfy this large judgment.[111]

---

[108]    *See* Pl. Mem. at 17.

[109]    *See Gottesman v. General Motors Corp.*, 401 F.2d 510, 512 (2d Cir. 1968) (holding that Rule 54(b) certification was appropriate where the claims required "different exhibits, proof and witnesses" and  "different sets of operative facts will determine the result").

[110]    *See* 6/16/10 Letter to the Court from Padian, Ex. A to Padian Aff.

[111]    *See Curtiss-Wright Corp.*, 446 U.S. at 12 ("[I]f its financial position were such that a delay in entry of judgment on Curtiss-Wright's claims would impair Curtiss-Wright's ability to collect on the judgment, that would weigh in

Accordingly, provided that plaintiffs dismiss their remaining claims, final judgment will be entered on plaintiffs' First and Second Causes of Action.

### D.    Pre-Judgment Interest

Because this Court is sitting in diversity, New York's choice of law rules determine which state's laws should be applied to calculate pre-judgment interest on plaintiffs' First and Second Causes of Action.[112]  "[U]nder New York choice of law principles, the allowance of prejudgement interest is controlled by the law of the state whose law determined liability on the main claim."[113] Delaware law therefore applies to the award and calculation of pre-judgment interest.

Under Delaware law, pre-judgment interest is calculated from the date payment was due[114] – in this case, April 26, 2007.  When the contract does not specify an interest rate, as in this case, "the legal rate of interest shall be 5% over the Federal Reserve Discount rate including any surcharge as of the time from

_____

favor of certification.").

[112]    *See Schwartz v. Liberty Mut. Ins. Co.*, 539 F.3d 135, 147 (2d Cir. 2008).

[113]    *Id.*

[114]    *See United States ex rel. Endicott Enters. v. Star Bright Constr. Co.*, 848 F. Supp. 1161, 1169 (D. Del. 1994).

29

which interest is due."[115]  The Federal Reserve discount rate for April 26, 2007 was

5.24 percent, which combined with the statutory five percent increase, results in an

interest rate of 10.24 percent per annum.  Accordingly, plaintiffs are entitled to

$3,534,904.03 in interest on their ten million dollar award.

## V.   CONCLUSION

For the reasons stated, plaintiffs' motion for summary judgment as to

damages is granted, and its motion to dismiss defendants' counterclaims is granted

in part and denied in part.  The Clerk of Court is directed to enter final judgment on

plaintiffs' First and Second Causes of Action and to close this motion (Docket No.

73).  A conference is scheduled for November 9, 2010 at 4:30 pm.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.


Dated:     New York, New York
           October 7, 2010

---

[115]     6 Del. C. § 2301(a).

30

**- Appearances -**

**For Plaintiffs:**

Gerald Padian, Esq.
Bradley M. Rank, Esq.
Howard M. Raber, Esq.
Tashjian & Padian
15 West 36th Street, 15th Floor
New York, NY 10018
(212) 319-9800

**For Defendants:**

Edward R. Gallion, Esq.
Steven Spielvogel, Esq.
Gallion & Spielvogel LLP
75 Rockefeller Plaza, 18th Floor
New York, NY 10019
(212) 710-5160