**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------- X

**JOEL ROSS, ERIC LEVINE, and**
**JERDE DEVELOPMENT COMPANY,**

**Plaintiffs,**

- against -

**STANLEY E. THOMAS and S.**
**THOMAS ENTERPRISES OF**
**SACRAMENTO, LLC,**

**Defendants.**

------------------------------------------------- X



**OPINION AND ORDER**

**09 Civ. 5631 (SAS)**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.   INTRODUCTION

By Order entered December 21, 2010, this Court appointed Melanie

L. Cyganowski as Receiver in this matter, authorizing her "to administer and

collect" certain interests of Stanley E. Thomas and S. Thomas Enterprises of

Sacramento, LLC (together, the "Debtors") "to the extent necessary to satisfy" the

$13,534,904.04 joint and several judgment entered against them by this Court on

October 12, 2010 (the "Judgment").[1]  In the same Order, and upon Judgment

---

[1]      *See* 12/21/10 "Appointment and Contempt Order" [Docket No. 103].

Creditors' ("Creditors") request, this Court held Thomas in contempt of Court.[2] Now before the Court are (1) the Receiver's Application for Allowance of Commission, Fees, Costs, and Expenses ("Receiver's Application")[3] and (2) Creditors' Application for Award of Attorneys' Fees Incurred in Addressing Defendant Thomas's Contempt as Compensation for Creditors' Expenses as Aggrieved Parties ("Creditors' Application").[4]  For the reasons that follow, the Receiver's Application is granted in its entirety, and the Creditors' Application is granted in part.

## II.    BACKGROUND

The background of this case, and the reasons for my appointment of a Receiver and decision to hold Thomas in contempt, are laid out in great detail in the December 21st Appointment and Contempt Order, and are further reflected in the transcript of an Oral Argument held in this Court on December 17, 2010, on an Order to Show Cause issued at Creditors' request.[5]  In short, after this Court entered the Judgment against Debtors on October 12, 2010, they appealed.

---

[2]      *See id.*

[3]      *See* Docket No. 116.

[4]      *See* Docket No. 130.

[5]      *See* Docket No. 106.

However, because they did not file a supersedeas bond, Creditors' enforcement of

the Judgment during the pendency of the Appeal was not stayed.  Accordingly, a

Restraining Notice was served upon Debtors on October 29, 2010, forbidding

Debtors to make or suffer any sale, assignment, transfer, or interference with any

property in which he or it had an interest.

Thomas violated the Restraining Notice.[6]  As a result, Creditors'

Georgia counsel (SGR) and New York counsel (Tashjian & Padian ("T&P"))

"settled on a multi-state strategy" to address Thomas's conduct.[7]  SGR would seek

---

[6]      *First*, Thomas encumbered certain land in the Cayman Islands
("Cayman Islands Land") by (1) creating a limited liability company ("Old
Milton"), (2) causing Old Milton to obtain a loan by giving a $6,500,000
Promissory Note to a hard-money lender, (3) personally making an Unconditional
Guaranty of Payment and Performance on the loan, and (4) collateralizing the
guaranty with the Cayman Islands Land.  The proceeds of the hard-money loan
were five certified bank checks ("Certified Checks") totaling $6,140,536.61 and
made payable to the "Rim Debtors" – four Thomas-controlled entities in
bankruptcy in the United States Bankruptcy Court, Northern District of Georgia.
The proceeds of the Certified Checks were intended to fund the Rim Debtors' exit
from brankruptcy.  *Second*, Thomas transferred five percent of his interests in the
Rim Debtors to J. Bruce Williams some time after October 29, 2010.  *See*
Appointment and Contempt Order.
        These violations were discovered on December 2, 2010, by Creditors'
counsel in Georgia –  Smith, Gambrell & Russell, LLP ("SGR") – while attending
a hearing in the bankruptcy cases filed by the Rim Debtors.  *See* Declaration of
Colin Delaney, Counsel for Creditors, in Support of Creditors' Application
("Delaney Decl.") ¶ 11.

[7]      *See id.* ¶ 12.  According to Creditors, "[f]rom entry of the Judgment in
October 2010 through the posting of the bond in February 2011, Judgment
Creditors relied on the services of both T&P and SGR for closely coordinated

emergency relief from the federal court in Atlanta, and would work with T&P in New York to prepare papers seeking to have Thomas held in contempt for violating the restraining notices.  In accordance with that strategy, T&P requested an Order to Show Cause (1) why Debtors should not be (i) enjoined from taking certain actions with respect to four specific properties controlled by Debtors, (ii) ordered to turn over the Certified Checks, and (iii) ordered to turn over stock certificates of any of the companies in which Debtors held interests ("Debtors' interests"); (2) why this Court should not appoint a Receiver to administer and collect Debtors' interests; and (3) why Thomas should not be held in contempt of court.  I granted the Order on December 12, 2010.[8]

Following briefing and oral argument, I appointed Cyganowski Receiver "[p]ursuant to Fed. R. Civ. P. 64 and CPLR § 5228(a)," and authorized her

---

judgment-enforcement litigation.  T&P worked on matters focused on New York, where this case was initiated and litigated to judgment, and where post-judgment collection activities began and ended.  SGR worked on matters focused on Georgia, where [] Thomas resides and manages his extensive business empire." Creditors' Application at 5-6.

[8]    *See* Docket No. 91.  Meanwhile, one day later, SGR sought a restraining order and charging orders against the entire Thomas Empire in Atlanta federal court, arguing that Thomas's contemptuous conduct showed the need for emergency injunctive relief.  *See* Delaney Decl. ¶ 12.  The Atlanta federal court granted the motion, entering a preliminary and permanent injunction on December 15, 2010.  *See id.*

> to administer and collect Debtors' interests in (i) any of the LTDs and (ii) any other limited-company or corporation ("Debtors' interests") to the extent necessary to satisfy the Judgment; Debtors retain the power to improve, lease, repair, and/or sell those interests for the purpose of satisfying the Judgment, but may do so only with the prior approval of the Receiver.[9]

I indicated that

> [t]he Receiver is entitled to reimbursement by Debtors for necessary expenses and a commission of Eight Hundred and Thirty-Five Dollars ($835) per hour, not to exceed five percent of the sums received and disbursed by her, and is authorized to engage and employ persons, including accountants, attorneys, investigators and experts, to assist in the carrying out of her duties and responsibilities, such individuals to be reimbursed for necessary expenses and compensated at an hourly rate.

I also ordered Debtors immediately to turn over to the Receiver any stock certificates representing Debtors' interests and held Thomas in civil contempt of Court. I ordered Thomas to purge his contempt either by (1) unwinding the transaction that led to the encumbrance of the Cayman Islands Land or (2) posting a supersedeas bond in the full amount of the Judgment ("Appeal Bond"). Thomas was also ordered to pay ten thousand dollars per day for each day after December 20, 2010 until January 20, 2011 that he remained in contempt, and to be jailed for every day following January 20, 2011 that he remained in contempt. In an order dated December 30, 2010, I clarified that Thomas was to pay his contempt fines to

---

[9]    Appointment and Contempt Order.

-5-

the Receiver ("12/30 Order").

The same day, Debtors moved the United States Court of Appeals for the Second Circuit to stay enforcement of the payment provisions of the Appointment and Contempt Order and the 12/30 Order (together, the "Contempt Orders") (the "Stay Motion").  The Second Circuit stayed enforcement *conditioned on* Debtors' filing a supersedeas bond in the amount of one-hundred thousand dollars.  On January 5, 2011, Debtors filed a supersedeas bond in that amount (the "Stay Bond"), but both the Receiver and Creditors alleged deficiencies in such bond as not in conformance with either the Contempt Orders or the Second Circuit's order.  In an attempt to remedy the deficiencies in the bond, the Receiver filed an opposition to the Stay Motion in the Second Circuit (the "Stay Opposition") on the grounds that the bond: (a) omitted from its factual recitations that it was issued with respect to the appeal from the contempt order and did not set forth the purpose of the Bond; (b) did not recite that, in accordance with the Court's Orders, the one-hundred thousand dollars should be paid to the Receiver upon the determination by the Second Circuit – were it to so decide – that the appeal was denied; and (c) did not make clear whether the Stay Bond would be available to pay the full amount of the daily contempt fees which, by the time the Stay Motion was decided, would likely be far in excess of one-hundred thousand

dollars.

After the filing of the Stay Opposition, Creditors requested that the Second Circuit adjourn adjudication of the Stay Motion to afford Thomas additional time to secure financing and take steps to purge his contempt by posting a bond for the full amount of the Judgment by January 20, 2011.  By Order dated January 11, 2011, the Second Circuit agreed to adjourn its hearing of the Stay Motion and granted a stay of enforcement of the payment provisions of the Contempt Orders for nine days conditioned on the Debtors' posting a second supersedeas bond for ninety-thousand dollars.

Also during this same time period, Creditors requested that the Receiver and her counsel review and authorize various proposed settlements involving assets owned by Thomas and his affiliated entities.  In connection with one such proposed settlement, on January 18, 2011, the Receiver received $19,866.15 in proceeds, to be held in escrow, as a condition of her having authorized a sale of certain restrained real property controlled by Thomas located in Sarasota, Florida.  In addition, Thomas sought authority from the Receiver and the Court to consummate the sale of certain real property he controlled in the Cayman Islands (the "Cayman Islands Sale") so that he could obtain the funds necessary to secure the ultimate satisfaction in full of the Judgment and all

expenses associated with it, thereby (a) purging his contempt, (b) staying all further enforcement of the Judgment during the pendency of the appeal to the Second Circuit, and (c) obtaining a release of all restraints presently in effect arising from the entry of the Judgment and related proceedings.

On January 18, 2011, I entered an order signed on January 14, 2011 (the "Settlement Order") lifting the restraints contained in the prior Orders of this Court to the extent of permitting Thomas to consummate and close on the Cayman Islands Sale enabling Thomas to provide the Receiver with fourteen million dollars to be held in escrow.  Thereafter, Thomas closed and consummated the Cayman Islands Sale and caused fourteen million dollars to be delivered to the Receiver on January 18, 2011, which funds were held in escrow by the Receiver.  In the Settlement Order, I directed the Receiver to hold in escrow all proceeds *not* used to procure a conforming Appeal Bond, which proceeds would be available to pay

> (i) such fees, costs, and expenses of the Receiver and her counsel as shall be allowed by the Court on application by the Receiver . . . , and (ii) such other amounts as the Court may award in favor of any party hereto upon application to the Court . . . .[10]

All remaining amounts, I directed, were to be "remitted by the Receiver to Thomas

---

[10]     Settlement Order ¶ 18.

upon the termination of the Receivership, or further Order of this Court."[11]

As part of the global settlement entered into by the parties pursuant to the Settlement Order, the Receiver also withdrew a "limited objection" she had filed to the Disclosure Statement for the Rim Debtors' Third Amended Joint Plan of Reorganization (the "Plan") in their consolidated Northern District of Georgia Chapter 11 bankruptcy cases.  The Rim Debtors' proposed Plan contemplated the disposition of assets of the Debtors (particularly of Thomas) that were restrained by the terms of the Appointment Order.

On February 8, 2011, I entered another order directing the Receiver to release from escrow and remit to a named surety sufficient funds to obtain a supersedeas bond in the amount of the Judgment and to pay the surety's premium for issuance of the appeal bond ("Bond Order").[12]  After the Receiver paid the surety for the face amount of the bond and the premium, $369,915.11 remained in

---

[11]     *Id.* ¶ 19.  Following entry of the Settlement Order, SGR worked with Thomas's counsel to prepare and submit joint motions to dissolve the restraints and charging orders in Georgia and return property that was levied upon by a Georgia sheriff or subject to garnishment in Georgia courts, as required by the Settlement Order.  *See* Delaney Decl. ¶ 13.  Similarly, T&P "coordinated and supervised the unwinding of various actions taken in California, Texas, Florida and Georgia to enforce the Judgment," as required by the Settlement Order.  *See* Affidavit of Gerald Padian, Counsel for Creditors, in Support of Creditors' Application ("Padian Aff.") ¶ 17.

[12]     *See* Docket No. 111.

escrow held by the Receiver.[13]  In accordance with the Bond Order, Creditors

calculated that over a period of two years, $64,967.54 in post-judgment interest

would accrue on the Judgment (the "Interest Amount").[14]

## III.   DISCUSSION

### A.   Receiver's Application

The Receiver now applies for allowance of payment of $299,519.55,

providing as support a detailed list of professional services rendered; computerized

time records; a summary sheet of the attorneys and paraprofessionals and their

corresponding initials, billing rates, and the number of hours incurred by

Receiver's Counsel, along with computerized time records of Counsel; and a

computerized printout of the disbursements of the Receiver and her Counsel,

actually and necessarily incurred in the performance of the Receiver's duties.

Debtors object to the Receiver's Application, maintaining that it should be rejected

in its entirety because (1) the Rules of the Chief Judge of the New York State

---

[13]     *See* Schedule 1 to the Declaration of Melanie L. Cyganowski, Esq., in
Support of Receiver's Application, Ex. A to Receiver's Application.

[14]     In the Bond Order, the Receiver was directed to remit the Interest
Amount to the Clerk of the Court to be held in the registry for the sole and
exclusive benefit of Creditors as security for payment of accruing post-judgment
interest.  *See* Bond Order ¶¶ 5-7.  Therefore, after payment of the Interest Amount,
$304,947.57 remains in escrow for satisfaction of the Receiver's Application and
Creditors' Application.

Court of Appeals "preclude[] a receiver from using the services of his or her law firm in the absence of a 'compelling reason'"[15] and (2) the Receiver "improperly seeks reimbursement for services that her own submissions demonstrate fall well beyond the appropriate scope of her appointment."[16]

### 1.   Applicability of the Rules of the Chief Judge of New York

Section 36.2 of Title 22 of the New York Compiled Codes, Rules and Regulations governs "Appointments by the Court." Subsection (c)8 of part 36.2 of the Rules provides that

> [n]o receiver or guardian shall be appointed as his or her own counsel, and *no person associated with a law firm of that receiver or guardian shall be appointed as counsel to that receiver* or

---

[15]     Debtors' Objection to Receiver's Application at 1 (quoting N.Y. Comp. Codes R. & Regs. 22 § 36.2(c)(8)).

[16]     *Id.* at 2.  Debtors do not challenge either the hourly rates charged by the Receiver's firm, Otterbourg, Steindler, Houston & Rosen, P.C. ("OSH&R"), or the amount of time spent by the individual OSH&R attorneys in completing any of the tasks performed on behalf of the Receiver.  *See, e.g.*, *Finkel v. Allstate Elec. Corp.*, No. 09-CV-4071, 2010 WL 5558899, at *6 (E.D.N.Y. Nov. 24, 2010) ("To determine whether attorneys' fees are reasonable, the Second Circuit uses the 'presumptively reasonable fee,' which equals a reasonable hourly rate multiplied by a reasonable number of expended hours.") (quoting *Simmons v. New York City Transit Auth.*, 575 F.3d 170, 174 (2d Cir. 2009)) (citing *Arbor Hill Concerned Citizens Neighborhood Assoc. v. County of Albany*, 493 F.3d 110, 117-18 (2d Cir. 2008) and *Finkel v. Omega Commc'n Servs., Inc.*, 543 F. Supp. 2d 156, 164 (E.D.N.Y. 2008)).

guardian, unless there is a compelling reason to do so.[17]

Debtors argue that, because the Appointment Order "specifically invokes [N.Y.C.P.L.R. § 5228(a)] as the statutory authority for" the appointment of the Receiver – a provision of New York law – and because "New York law expressly prohibits a receiver from employing the services of his or her law firm to assist him or her in execution of the duties of the receiver," I must reject the Receiver's instant application,[18] at least to the extent it seeks allowance for services "illegally provided by other individuals at [the Receiver's] law firm," which amount to $192,603.50.[19]

I note at the outset that the Appointment and Contempt Order specifically authorized the Receiver to retain counsel of her own choosing and did not prohibit her from retaining her own law firm, OSH&R. Indeed, this Court was unaware of part 36.2 when it issued the Appointment Order and knew the Receiver

---

[17]    22 N.Y. Comp. Codes R. & Regs. § 36.2(c)(8).  In addition, persons seeking appointments as receivers are required to complete a certified training course as a prerequisite to their eligibility.  Part 36.2 also bars or limits political leaders, high-level court officials and former judges from accepting fiduciary appointments, and disqualifies lawyers who earn more than fifty-thousand dollars from court appointments in a single year from accepting any appointments in the following year.

[18]    Debtors' Objection to Receiver's Application at 3.

[19]    *Id.* at 5.

had retained her own law firm as Counsel.  And despite Debtors' full knowledge of the same, they have remained silent until now concerning the Receiver's retention of OSH&R.

Of course, oversight as to the applicability of a Rule does not excuse its application.  But part 36.2 was not and is not applicable to the receivership in this case, for two reasons.  *First*, *whether* a federal court should appoint a receiver in a diversity action – a power it holds in equity – is governed by federal law.[20] "[A]lthough a state statute may provide a vehicle for the appointment of a receiver, such a statute does not change the nature of the federal courts' equitable powers."[21]

---

[20]    *See* Fed. R. Civ. P. 66 ("These rules govern an action in which the appointment of a receiver is sought or a receiver sues or is sued."); *Varsames v. Palazzolo,* 96 F. Supp. 2d 361, 365 (S.D.N.Y. 2000) ("Whether a federal court should appoint a receiver in a diversity action is governed by federal law."); 12 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 (1973).  "The following factors are considered relevant to establishing the need for a receivership: '[F]raudulent conduct on the part of defendant; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.'" *Varsames*, 96 F. Supp. 2d at 365 (quoting Wright & Miller § 2983).  I have already found most of these factors to be present in this case.  *See* Transcript of Oral Argument on Order to Show Cause held on December 17, 2010 [Docket No. 106].

[21]    *Canada Life Assurance Co. v. LaPeter*, 563 F.3d 837, 843 (9th Cir. 2009) ("In [*Guaranty Trust Co. of New York v. York*], the [Supreme] Court acknowledged that a federal court sitting in equity is not constrained by what

It is true that this Court invoked a New York state statute – N.Y.C.P.L.R. § 5228(a) – when appointing the Receiver pursuant to Federal Rule of Civil Procedure 64, under which "every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment."[22]  But my power to *appoint* a receiver is governed by federal law, even if "the practice in *administering* an estate by a receiver . . . must accord with the historical practice in federal courts *or with a local rule*"[23] – here, N.Y.C.P.L.R. § 5228(a).  And, at least in this Court's view, the process by which a federal court *appoints* a receiver does not fall within "the practice in administering an estate" such that a federal court is bound by local rules setting forth certain requirements for and prohibitions on state courts' appointment of receivers and guardians.[24]  Nor does a receiver's retention of her counsel fall within "the

---

remedies are available under state law.  [*See* 326 U.S. 99, 105 (1945).]  Thus, regardless of whether state law provides a vehicle by which to appoint a receiver, the federal courts are free to provide that remedy solely by virtue of their equitable powers.") (citations omitted).

> [22]      Fed. R. Civ. P. 64.

> [23]      Fed. R. Civ. P. 66 (emphasis added).

> [24]      *See Phelan v. Middle States Oil Corp.*, 210 F.2d 360, 363 (2d Cir. 1954):

>> "[A]dministration" means *the receiver's dealings with the property*, and the "practice" in such administration refers to orders he must get to allow [her] to dispose of the property, to spend

receiver's dealings with the property"[25] such that it, too, would be governed by a

local rule.  Therefore, in the absence of any federal restraints analogous to those

supplied by part 36.2 on the method of appointment or a receiver's retention of

counsel, I hold that the Receiver's retention of OSH&R was proper.

     *Second*, the history and genesis of part 36 reinforce its inapplicability

to a receivership created by a federal court judge sitting in diversity jurisdiction.[26]

Former Second Circuit Judge Sonia Sotomayor carefully recounted that genesis in

*Kraham v. Lippman*:

> New York courts appoint fiduciaries to assist courts and litigants
> in a number of capacities, including as guardians for incapacitated
> persons,  receivers  for  properties  involved  in  foreclosure

---

> money to protect it, to distribute it among the creditors or lienors,
> and the like.  In short, the "practice" means the procedure by
> which [she] gets the power to do those things which an owner of
> the property would have without court authorization.  It is only
> after [she] has "administered" the "estate" and wishes to get
> immunity from personal liability that [she] files [her] final
> accounting and brings the parties into court to assert any claims
> they may make against [her] personally on account of [her]
> administration.  We doubt whether even [her] application for an
> allowance is a part of [her] administration, although it does
> determine how a part of the assets shall be distributed.

[25]    *Id.*

[26]    Indeed, by its express terms, Part 36 applies only to "appointments by any judge or justice of the *[New York State] Unified Court System.*"  22 N.Y. Comp. Codes R. & Regs. § 36.1(a).

proceedings, and guardians ad litem for children involved in litigation. In general, fiduciary appointees are private attorneys who are compensated from the assets of the individuals or businesses they have been assigned to represent or manage, and many fiduciary positions are highly remunerative. Because judges historically have had unregulated discretion to make these appointments, the process has been susceptible to abuse – *for example, by judges' choosing appointees based on political connections* – and has long been a subject of public attention and controversy. Beginning in 1967, New York undertook a number of reforms in the hopes of eliminating corruption in the process, but none successfully alleviated the problem. In January 2000, *public concerns about political influence in court fiduciary appointments* reached a peak, after the press published a letter written by two disgruntled attorneys seeking to perpetuate their receipt of Brooklyn Supreme Court appointments as a political reward for service to their party.

In response to the explosion of public concern generated by the letter's disclosure, and the resulting impairment of public confidence in the judicial system, Chief Judge Judith S. Kaye announced a comprehensive program to reform the appointment process. To further this purpose, she established a Commission on Fiduciary Appointments (the "Commission") and an Office of the Special Inspector General for Fiduciary Matters (the "Special Inspector General"), and charged them with gathering data on appointments and making recommendations for improved practices. After conducting far-reaching investigations, these bodies released to the Chief Judge detailed reports documenting *widespread problems in the appointment process, including appointments based on political party connections*. For example, the Special Inspector General found that one county political leader had received nearly one hundred appointments, another had received over seventy-five appointments, and an attorney whose small law firm employs another county leader had received nearly one hundred appointments. In light of these findings, *the Commission recommended that political party leaders, their immediate relatives, and the partners, legal associates, and other employees of their law firms be prohibited*

> *from receiving judicial appointments while the leaders served and*
> *for two years after resigning their positions.*
>              In consultation with the Administrative Board of the
> Courts and with the approval of the New York Court of Appeals,
> Chief Judge Kaye responded to these recommendations by
> adopting a new part 36 of the Rules of the Chief Judge.[27]

This history makes clear that part 36 was enacted to curb some of the dysfunction

inherent in a (state) judiciary that is elected rather than appointed.  Federal judges

are, of course, also capable of political favoritism, but their appointment for life

rather than election for a fixed term renders the federal judiciary far less

susceptible to the types of abuses part 36 was enacted to curb, providing further

support for my holding that part 36.2 does not apply to this Court's appointment of

a receiver in this action or her retention of counsel.  Accordingly, Debtors'

objection to the Receiver's Application on this ground fails.[28]

### 2.      The Scope of the Services for Which the Receiver Seeks Reimbursement

        Debtors also contend that the Receiver should be denied

reimbursement for her services in connection with two proceedings: (1) her

---

[27]     478 F.3d 502, 504-05 (2d Cir. 2007).

[28]     Debtors also oppose the Receiver's Application to the extent it seeks
reimbursement for "*ex parte* meetings and telephone conversations with
*[Creditors'] attorneys*."  Debtors Opp. at 7 n.4 (emphasis in original).  But this
Court is aware of no rule prohibiting a Receiver from engaging in such
communications, which the Appointment Order in no way forbade.

intervention in the United States Bankruptcy Court for the Northern District of
Georgia to oppose Debtors' reorganization plan; and (2) her appearance before the
Second Circuit Court of Appeals to object to Debtors' request for a stay of the
contempt pending appeal based on the sufficiency and validity of Debtors'
supersedeas bond.  Both objections are without merit.

### a.    Applicable Law

As noted above, Rule 66 provides that "the *practice in administering
an estate by a receiver . . .* must accord with the historical practice in federal
courts *or with a local rule.*"[29]  Under New York law, a "receiver may exercise only
such powers as are granted pursuant to statute, as delimited by court order."[30]  "A
Receiver is an officer of the court and not an agent of the mortgagee or the owner. .
. . [Her] duty is to preserve and operate the property, within the confines of the
order of appointment and any subsequent authorization granted to [her] by the
court."[31]

### b.    Application

---

[29]    Fed. R. Civ. P. 66 (emphasis added).

[30]    *Jacynicz v. 73 Seaman Assocs.*, 704 N.Y.S.2d 68, 70 (1st Dep't 2000)
(citations omitted) (citing *Daro Indus. v. RAS Enters.*, 44 N.Y.2d 969, 970 (1978)).

[31]    *Kaplan v. 2108-2116 Walton Ave. Realty Co.*, 425 N.Y.S.2d 817
(1980) (citations omitted).

Under N.Y.C.P.L.R. § 5228(a), receivers may be authorized "to administer, collect, improve, lease, repair or sell any real or personal property in which the judgment debtor has an interest or to do any other acts designed to satisfy the judgment."[32]  The Appointment and Contempt Order, as noted above, authorized the Receiver to

> *to administer and collect Debtors' interests* in (i) any of the LTDs and (ii) any other limited-company or corporation ("Debtors' interests") *to the extent necessary to satisfy the Judgment*; Debtors retain the power to improve, lease, repair, and/or sell those interests for the purpose of satisfying the Judgment, but may do so only with the prior approval of the Receiver.

### i.      Objection to the Rim Debtors' Plan of Reorganization

One of the essential underpinnings of the Rim Debtors' Plan was a contemplated capital contribution to be made by Old Milton – an entity solely controlled by Thomas – to fund distributions to certain creditors in the Rim Debtors' bankruptcy cases.  Those distributions were to be made on the effective date of the Rim Debtors' Plan and, as described above, derived from the Certified Checks that comprised the proceeds of a loan that Thomas procured for Old Milton from a third party – by further encumbering assets that he controlled – in violation of the restraints imposed on him by New York law and the Appointment Order.

---

[32]     N.Y.C.P.L.R. § 5228(a).

Thus, the Rim Debtors' proposed Plan contemplated the disposition of assets of Debtors – particularly of Thomas – that were restrained by the terms of the Appointment Order.[33]  I appointed the Receiver to "administer and collect the Debtors' interests" to the extent necessary to satisfy the Judgment against the Debtors; this encompassed all actions necessary to prevent the dissipation of any proceeds of the Certified Checks for purposes other than the satisfaction of the Judgment.  Accordingly, the Receiver's objection to the Rim Debtors' Plan fell "within the confines of the order of appointment."[34]

### ii.    The Second Circuit Intervention

The Receiver appeared in the Second Circuit to assure that the Debtors were required to post a proper bond that complied with the terms of the Contempt Orders.  In particular, she sought to ensure that, as Receiver, she would "collect" one-hundred thousand dollars of Debtors' interests – then bonded – upon any denial of the Debtors' appeal by the Second Circuit.  Accordingly, her actions fell within the scope of the Appointment Order.

### 3.    Receiver's Request for Additional Compensation for Time and Expense in Responding to Judgment Debtors' Objection

---

[33]    Indeed, I directed Thomas to purge his contempt by, among other things, retrieving the Certified Checks.

[34]    *Kaplan*, 425 N.Y.S.2d at 817 (citations omitted).

As part of the $299,519.55 allowance for which the Receiver applies, $7,500 is "for payment of any additional fees and expenses of the Receiver and/or OSH&R for services performed after the date of this Application (but prior to the Receiver's discharge) rendered in connection with this Application and any other related fees and expenses, including payment for expenses incurred for computerized legal research that have been incurred but not yet recorded, as to which nothing has been paid to date."[35]  In her Reply Declaration, the Receiver also seeks to "reserve the right to request the allowance of additional fees and expenses (both for [the Receiver] and for [her] counsel) in the event of [an] appeal [of this ruling], to be paid from any available remaining proceeds of the Receivership or, if necessary, from the proceeds of the *supersedeas* bond procured by the Receiver for the Judgment Debtors' account in connection with their pending appeal from the Judgment."[36]

Debtors do not oppose the Receiver's request for reimbursement for fees, costs, and expenses incurred in the preparation of the instant Application. Nor in their sur-reply do they object to the Receiver's request to apply for an allowance of additional fees and expenses associated with any appeal of *this* ruling.

---

[35]     Receiver's Application at 12.

[36]     Reply Declaration of Melanie L. Cyganowski, Esq., in Support of Receiver's Application at 10.

Indeed, there is no reason why a Receiver – like any party entitled to an award of attorneys' fees – should not be "entitled to compensation 'for time *reasonably* spent in preparing and defending' the fee application"[37] – i.e., "fees on fees."

Debtors' objection, instead, is to the "unspecific" nature of the future services for which the Receiver requests $7,500.[38]  Responding to Debtors' (proper) objection, I asked the Receiver to supplement her Application by providing additional support for the fees and expenses incurred after her initial (March 4, 2011) filing of the Application.  Those expenses, according to the Receiver's June 1, 2011 Sur-Reply Declaration, amounted to an additional $44,191.11, which the Receiver attributes to the "vigorous opposition filed by the Judgment Debtors" to her Application:

> When I first filed my Fee Application, I did not foresee more than 7.5 hours of additional services to be performed.  Among other reasons, I believed that the Judgment Debtors had agreed, as part of the Settlement Order filed with the Court on January 24, 2011, to the allowance of the Receiver's commissions and the fees and expenses of OSH&R, except with respect to any challenge based on reasonableness. [But] [b]ecause of the vigorous opposition

---

[37]    *Robbins & Myers, Inc. v. J.M. Huber Corp.*, No. 01–CV–00201S, 2011 WL 1598973, at *6 (W.D.N.Y. Apr. 27, 2011) (quoting *Weyant v. Okst*, 198 F.3d 311, 316 (2d Cir. 1999)) (emphasis added).  "As a general matter, such 'motion costs should be granted whenever underlying costs are allowed.'"  *Weyant*, 198 F.3d at 316 (quoting *Valley Disposal, Inc. v. Central Vt. Solid Waste Mgmt. Dist.*, 71 F.3d 1053, 1060 (2d Cir. 1995)).

[38]    Debtors' Objection to Receiver's Application at 10.

filed by the Judgment Debtors, both myself and my counsel have been required to spend time analyzing, reviewing, and researching the papers filed in opposition to the Fee Application by the Judgment Debtors, and also preparing a reply in further support of the Fee Application.[39]

Having carefully reviewed the Receiver's Sur-Reply Declaration, and the detailed time records attached as exhibits, I conclude that the Receiver is entitled to reimbursement for all of this additional $44,191.11 in fees "for time reasonably spent in opposing [Debtors' objection] and in . . . defending [her] initial fee application."[40]  Therefore, the Receiver's Application for $336,210.66[41] in fees is granted in its entirety.

However, only $304,947.57 is available in escrow.  Although this Court's previous orders envisioned that the Receiver's allowance would be paid out of this escrow account, there is no reason why that allowance – all of which stems in the first instance from Thomas's contemptuous conduct – should be

---

[39]      Sur-Reply Declaration of Melanie L. Cyganowski, Esq., in Further Support of Receiver's Application ¶¶ 6-7.

[40]      *Weyant*, 198 F.3d at 316.  A small portion of the additional expenses for which reimbursement is sought in the Sur-Reply Declaration constitutes reasonable expenses incurred in further execution of the Receiver's duties as Receiver, and is therefore also allowable.

[41]      $366,210.66 represents the initial $299,519.55 requested, less the unspecific request for $7,500, plus the additional $44,191.11 requested in the Sur-Reply Declaration.

limited by the arbitrary amount of funds remaining in escrow after the posting of

the Appeal Bond and transmittal of the Interest Amount.[42]  Contrary to Debtors'

contention, the escrow account does not define "the outer limits of [Debtors']

financial exposure."[43]  Rather, the escrow fund is one potential *source* of attorneys'

fees and expenses.  My reasons for previously directing that any fees be paid out of

the escrow account was to ensure that there would be at least *some* funds available

to satisfy the Receiver's and Creditors' requests for such fees, in light of Thomas's

multiple attempts – prior to being held in contempt – to tie up every last dollar he

had in assets unreachable by Creditors.  Those escrow funds' having been depleted

entirely, Debtors are now directly liable to the Receiver for the balance of her

Application – $31,263.09.

### B.   Creditors' Application

---

[42]     As Creditors rightly note, "[w]hatever anyone might have assumed when negotiating the [Settlement] Order in mid-January, no one knew for certain how much the bond premium would be, how much would be needed to cover future interest on the judgment, how much the Receiver would ultimately apply for as a commission, or how much work was entailed in actually obtaining the bond required by the [Settlement] Order."  Creditors' Reply to Debtors' Objection to Creditors' Application at 8.

[43]     Debtors' Objection to Creditors' Application at 9.  Nor was it "impliedly assumed by all participants" – including the Court – "that the agreed upon size of the escrow account to be funded by [] Thomas would be sufficient to satisfy all subsequent demands for attorneys' fees by the [R]eceiver and [Creditors'] lawyers."  *Id.* at 8.

In a separate application, Creditors apply for an award of $134,125.27 in attorneys' fees, providing as support the declarations of attorneys Gerald Padian (T&J) and Colin Delaney (SGR) attesting to their firms' work addressing Thomas's contemptuous conduct; the reasonableness of the work done and time spent on tasks related to Thomas's contempt; the reasonableness of the rates charged to Creditors for the work; and that the rates are their firm's customary rates for work of this nature.[44]   Attached to their declarations are copies of their firms' billing statements for the periods during which Creditors "dealt with [] Thomas's contemptuous conduct."[45]   Debtors object to Creditors' Application on the grounds (1) that they seek "compensation for work performed as part of the *enforcement and collection activities* that [Creditors] had launched long before they became aware of the transaction that formed the basis of their contempt motion"[46] and (2) that Creditors' lawyers' time entries are too vague to support an award of attorneys' fees.

      **1.**      **Applicable Law**

---

[44]     *See* Delaney Decl.; Padian Aff.

[45]     Delaney Decl. ¶ 15; Padian Aff. ¶ 19.

[46]     Debtors' Objection to Creditors' Application at 2 (emphasis added). As with the Receiver's Application, Debtors do not object to the reasonableness of the hourly rates charged by Creditors' attorneys.

"[T]he sanctions for civil contempt serve two purposes: to coerce future compliance and to remedy any harm past noncompliance caused the other party. . . .  The compensatory goal . . . can only be met by awarding to the plaintiff any proven damages."[47]  "The amount awarded should be the fees and costs incurred by the aggrieved party as a direct product of the contemptuous conduct."[48]  Moreover, "it is appropriate for the court . . . to award the reasonable costs of prosecuting the contempt, including attorney's fees . . . ."[49]  "[W]hile willfulness may not necessarily be a prerequisite to an award of fees and costs, a finding of willfulness strongly supports granting them."[50]

### 2.   The Scope of the Services for Which Creditors' Attorneys Seek Fees

Having closely reviewed the clear and detailed time entries[51] attached

---

[47]   *Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996) (citations omitted) (citing *United States v. United Mine Workers of Am.*, 330 U.S. 258, 302-04 (1947)).

[48]   *Lembo v. Mayendia-Vales*, 739 N.Y.S.2d 775, 790 (3d Dep't 2002).

[49]   *Vuitton et Fils S. A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979).

[50]   *Weitzman*, 98 F.3d at 719 (footnote omitted).

[51]   Debtors' contention that the time entries do not provide "sufficient clarity and detail to enable the reviewing court to render a fair and informed determination as to their appropriateness for payment" is patently false.  Debtors' Objection to Creditors' Application at 5-6.  Moreover, very few of SGR's time records "commingl[e]" non-contempt-related work with contempt-related work, as

to the attorney declarations submitted in support of Creditors' Application, I

conclude that $129,379.27 of those entries reflect reasonable costs incurred "as a

direct product of [Thomas's] contemptuous conduct"[52] – *not* as a result of

Creditors' attempts to enforce the Judgment, as Debtors contend.[53]  Debtors'

argument overlooks the fact that it was *Thomas's contemptuous conduct* that

resulted in the drastic diminution in assets reachable by Creditors to satisfy the

Judgment.[54]  Absent that contemptuous conduct, the extraordinary restraints I

placed on Thomas's ability to control certain of his proprietary interests – *above

and beyond* the restraints already imposed as a result of Creditors' *enforcement*

efforts – would not have been necessary.  Nor would the restraints and charging

orders sought and obtained by SGR attorneys in Atlanta federal court have been

_____

Debtors assert, *id.* at 7; for those that do, the SGR invoices make clear that the firm
"conservatively apportioned" such work to contempt-related work, Creditors'
Reply to Debtors' Objection to Creditors' Application at 5.

[52]    *Lembo*, 739 N.Y.S.2d at 790.

[53]    Debtors argue that Creditors may not recover any costs incurred (1)
after the entry of the Appointment and Contempt Order on December 21, 2011,
when Thomas was found to be in contempt; (2) in connection with attempting to
collect their Judgment in Georgia; or (3) in connection with securing and finalizing
the supersedeas bond.  *See* Debtors' Objection to Creditors' Application at 5.

[54]    Debtors' argument also appears to rest on an inexplicable misreading
of Creditors' attorneys' declarations and the time entries for which they seek an
award of fees.  *See id.* at 6-7.

necessary absent Thomas's contemptuous conduct – restraints that cost Creditors

money in the form of attorneys' fees both to obtain and to unwind (when Thomas

finally purged his contempt by posting the supersedeas bond).

          In sum, *all* of the costs incurred by Creditors to obtain and enforce the

terms of the Appointment and Contempt Order and the emergency relief granted in

Atlanta federal court were a "direct product of [Thomas's] contemptuous conduct,"

including Creditors' attorneys'

- discussions regarding how to address Thomas's contemptuous conduct,
  preparations for court appearances and filings seeking relief for that conduct,
  and research into the highly complex business transactions that constituted
  Thomas's contemptuous conduct;[55]

- development of strategies for implementing, and implementation of, this
  Court's Appointment and Contempt Order, including working with the
  Receiver to effect the turnover of the Certified Checks and Thomas's
  interests in certain properties;[56]

- discussions, research, and actions taken regarding the means by which

---

[55]    *See, e.g.*, SGR January 20, 2011 Invoice, Ex. A to Delaney Decl., at 4-20; T&J January 5, 2011 Invoice, Ex. A to Padian Aff., at 1-4.

[56]    *See, e.g.*, SGR January 20, 2011 Invoice at 20, 22, 23; SGR February 17, 2011 Invoice, Ex. A to Delaney Decl., at 2, 3; T&J January 5, 2011 Invoice at 5-6.

Thomas might purge his contempt by unwinding the Old Milton transaction, including objecting to the Rim Debtors' Plan;[57]

- responses to Debtors' motion to stay this Court's contempt order and evaluations of and responses to Debtors' allegedly deficient Stay Bond;[58]

- efforts taken to facilitate Thomas's sale of the Cayman Islands Land and to execute the Settlement Order;[59]

- actions taken to unwind restraints imposed as a result of Thomas's contemptuous conduct;[60]

- research and actions taken to ensure that the Appeal Bond was properly posted (one of the means by which Thomas was ordered to purge his contempt).[61]

Therefore, subtracting $4,746 in fees which I hereby find were *not* incurred as a

---

[57]    *See, e.g.*, SGR January 20, 2011 Invoice at 20, 22; SGR February 17, 2011 Invoice at 4.

[58]    *See, e.g.*, SGR January 20, 2011 Invoice at 23-24; SGR February 17, 2011 Invoice at 5-8; T&J January 5, 2011 Invoice at 6; T&J February 4, 2011 Invoice, Ex. A to Padian Aff., at 1-2, 5;

[59]    *See, e.g.*, SGR February 17, 2011 Invoice at 7-11; T&J February 4, 2011 Invoice at 3.

[60]    *See, e.g.*, SGR February 17, 2011 Invoice at 11-12; SGR March 3, 2011 Invoice, Ex. A to Delaney Decl., at 1-2.

[61]    *See, e.g.*, SGR February 17, 2011 Invoice at 11-13; SGR March 3, 2011 Invoice at 2; T&J February 4, 2011 Invoice at 3-5.

direct result of Thomas's contemptuous conduct – namely, fees incurred for

researching "whether other creditors of judgment debtor are necessary parties . . .

to a judgment creditors action to enforce judgment,"[62] addressing the United States

Attorney's Office's proposed motion to intervene,[63] and determining the Interest

Amount[64] – Creditors are entitled to an award of $129,379.27 in fees.  Finally, for

the same reasons I did not limit the Receiver's reimbursable expenses to the funds

held in escrow, Creditors are not prevented from recovering fees for addressing

Thomas's contemptuous conduct simply because the escrow fund is depleted.

Therefore, Debtors are now directly liable to Creditors for $129,379.27.

## IV.    CONCLUSION

For the foregoing reasons, it is HEREBY ORDERED that:

1.    The commission, fees, costs and expenses of the Receiver and her

---

[62]    SGR January 20, 2011 Invoice at 14 (12/12/10 JFW entry).  Creditors seek reimbursement for $1,325 for this research.  *See* SGR Spreadsheet of Contempt-Related Attorneys' Fees, Ex. B to Delaney Decl.

[63]    *See* SGR March 3, 2011 Invoice at 3 (2/8/11 CRD entry and 2/9/11 ASC entry) ($1,643.50); T&J March 4, 2011 Invoice, Ex. A to Padian Aff., at 2 (2/8/11 RGT entry and 2/9/11 GP entry) ($875).  Creditors seek reimbursement of $2,518.50 for these services.  *See* SGR Spreadsheet of Contempt-Related Attorneys' Fees; T&J Spreadsheet of Contempt-Related Attorneys' Fees, Ex. B to Padian Aff.

[64]    *See* T&J March 4, 2011 Invoice at 2 (2/7/11 BMR entry and 2/10/11 RGT, HMR, and GP entries).  Creditors seek reimbursement for $902.50 for these calculations.  *See* T&J Spreadsheet of Contempt-Related Attorneys' Fees.

counsel requested in the Receiver's Application, as modified by the Receiver's Sur-Reply Declaration, are allowed in full in the aggregate amount of $336,210.66;

2.   The attorneys' fees requested in the Creditors' Application are allowed in part in the aggregate amount of $129,379.27;

3.   As soon as practicable following entry of this Opinion and Order, the Receiver is hereby permitted and directed to remit the sum of $304,947.57 to OSH&R (which amount is inclusive of the Receiver's allowed commissions);

4.   Debtors are hereby liable to the Receiver in the amount of $31,263.09 and to Creditors in the amount of $129,379.27;

5.   The Receiver, and her counsel, shall be exempt from liability of any kind, nature or description arising from the good faith performance of her duties, responsibilities and obligations as Receiver;

6.   The Receiver shall be permitted to seek payment for such fees and expenses incurred in connection with any appeal taken from this Opinion and Order granting the Receiver's Application;

7.   The Receiver is hereby discharged and released from any and all duties to administer and collect any of Debtors' interests or to do any

-31-

other acts designed to satisfy the Judgment;

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:     New York, New York
           June 6, 2011

## - Appearances -

**For Receiver:**

Melanie L. Cyganowski, Esq.
Otterbourg, Steindler, Houston & Rosen, P.C.
230 Park Avenue
New York, New York 10169
(212) 661-9100

**For Plaintiffs-Judgment Creditors:**

John Jongmin Lee, Esq.
Colin Rhys Patrick Delaney, Esq.
Smith, Gambrell & Russell, LLP
250 Park Avenue
Suite 1900
New York, New York 10177
(212) 480-3500

**For Defendants-Judgment Debtors:**

Edward R. Gallion, Esq.
Steven Spielvogel, Esq.
Gallion & Spielvogel LLP
75 Rockefeller Plaza, 18th Floor
New York, New York 10019
(212) 710-5160